901 P.2d 1178

**GEMSTAR LIMITED, a former British Virgin Islands corporation; Canstar Limited, a former British Virgin Islands corporation; Kunst Corporation, Inc., a corporation; R. Pape Corporation, Inc., a corporation; Richard Holding, a corporation; H.K. Bergmann, Inc., a corporation; Kittan, Inc., a corporation; and James R. Tomasini, Plaintiffs–Appellees,**

v.

**ERNST & YOUNG fka Ernst & Whinney, a partnership; Edward A. Villanueva and Lynn Villanueva, husband and wife, Defendants–Appellants.**

No. 1 CA–CV 92–0313.

Court of Appeals of Arizona,
Division 1, Department A.

Feb. 14, 1995.

Review Granted on issues 1, 2 and 3 and Denied on other issues Sept. 12, 1995.*

---

\* Martone, J., of the Supreme Court, recused himself and did not participate in the determination of this matter.

Streich Lang by William S. Hawgood, II, Francis J. Burke, Jr., Jill B. Langley and Karen Potts, Phoenix, and Ernst & Young by Stephen N. Young, Kathryn A. Oberly and Emmett E. Eagan, Jr., Washington, DC, for appellants.

Copple, Chamberlin & Boehm, P.C. by Scott E. Boehm, and Newman, Ahern, Chambliss & Banen by Kevin T. Ahern, Phoenix, for appellees.

## OPINION

JACOBSON, Presiding Judge.

This lawsuit was brought by two British Virgin Island corporations, Gemstar, Ltd., and Canstar, Ltd. ("the corporations") and five shareholders of these corporations (collectively, "plaintiffs") as a result of defendants' accounting activities regarding two Arizona real estate transactions. Plaintiffs' essential theory of recovery is that, although they authorized and executed documents prepared by defendants in 1980 by which they sold two parcels of raw land for $10 million to a nonparty, Ziggy's Opportunities, Inc. ("Opportunities"), they had an oral "share and share alike" agreement with its owner and co-shareholder of the corporations, Seigfried ("Ziggy") Wauro, that entitled them to a proportionate share of the additional profits from Ziggy's subsequent sale of the properties in 1983–84. Plaintiffs alleged that defendants' accounting conduct caused them to lose more than $4 million in additional profits that Ziggy, through Opportunities, pocketed.

In a related lawsuit against Ziggy and Opportunities arising out of these same transactions, plaintiffs successfully pursued claims of breach of contract and breach of fiduciary duty, and were awarded damages of $2,527,181.00, with a judgment totalling $4,337,994.05.[1] In a second related action, plaintiffs pursued similar claims against the attorneys involved in these transactions, but settled those claims before trial. See Gems-

tar v. Goodson, CV–89–40772, Maricopa County Superior Court ("the Goodson case").

In this, the third lawsuit, plaintiffs sued the accountants involved in the transactions for accounting negligence, breach of fiduciary duty, constructive fraud, breach of contract, scheme and artifice to defraud, and racketeering. After a lengthy jury trial, plaintiffs were awarded $1,500,000.00 on each of the claims of breach of fiduciary duty, providing substantial assistance to Ziggy's breach of fiduciary duty, and breach of contract, and were awarded $2,400,000.00 on the accounting negligence claim. The trial court entered judgment for damages of $2,400,000.00, prejudgment interest of $1,554,365.40, attorneys' fees of $300,000.00, and costs of $4,403.07, for a total of $4,258,768.47. After denial of their post-trial motions, defendants timely appealed.

Although defendants have presented numerous issues on appeal, we find one issue dispositive. Because we find that plaintiffs did not have capacity to sue under the circumstances and theories of this case, we need not address the remaining issues.

## FACTUAL BACKGROUND

On appeal after a jury verdict, we view the facts in the light most favorable to upholding the jury verdict and judgment. *Rhue v. Dawson,* 173 Ariz. 220, 223, 841 P.2d 215, 218 (App.1992). We also view the evidence and all reasonable inferences therefrom in favor of the prevailing party. *Schnyder v. Empire Metals, Inc.,* 136 Ariz. 428, 429, 666 P.2d 528, 529 (App.1983).

The plaintiff corporations, Gemstar, Ltd., and Canstar, Ltd., were formed in 1979 as British Virgin Island corporations to take advantage of the federal capital gains tax exemption available at that time to foreign corporations that purchased and sold United States real estate. The individual shareholder plaintiffs [2] and Ziggy agreed to incorporate Gemstar and Canstar to purchase for

---

1. On appeal, that judgment was affirmed in part, and remanded in part with directions to recompute the damages to conform to the evidence. *Kunst Corporation, Inc. v. Wauro,* 1 CA–CV 90–0655 (Ariz.App. mem. dec. filed July 26, 1994) ("the Wauro case").

2. This lawsuit involves five of the former shareholders who together held a 60% interest in the corporations. Ziggy held a 30% interest, and one remaining stockholder, who did not join these suits, held the remaining 10%.

investment two 40–acre parcels of land that Ziggy had located in Arizona. The shareholders also agreed to share in any profit or loss on the properties in relation to their initial investment, an agreement they refer to as "share and share alike." Ziggy was named president, treasurer, and American representative director of both corporations. The corporations hired the accounting firm of Ernst & Young (formerly Ernst & Whinney) and, specifically, its partner, Edward A. Villanueva, to prepare their tax returns and unaudited financial statements. Villanueva had been Ziggy's personal accountant since 1978.

In 1979, the first parcel, at 51st Avenue and McDowell Road in Phoenix, was purchased by Canstar for $900,000; the second parcel, at 56th Street and Warner Road in Tempe, was purchased by Gemstar for $500,000.

In early 1980, Villanueva informed Ziggy that proposed federal legislation involving the Foreign Investment in Real Property Tax Act ("FIRPTA") could eliminate the federal tax savings to foreign investors by imposing capital gains tax on any resale profits of raw land. Villanueva suggested that the corporations sell the parcels prior to the passage of the pending FIRPTA provisions to take advantage of the existing capital gains exemption before the new law became effective. The shareholders contend that Ziggy told them that, because the Arizona real estate market was depressed at the time and they were unlikely to find a buyer, the corporations could sell the properties to Opportunities, Ziggy's "shell" corporation, thus preserving their tax benefits while at the same time keeping effective their original "share and share alike" agreement for when the land was sold to a third party in the future.

When Ziggy informed Villanueva of the decision to sell the land and described the details of that sale, Villanueva, for purposes of recording the parties' intent, drafted short-form "Agreements of Sale" by which, effective May 1, 1980 (prior to the effective date of FIRPTA), Canstar agreed to sell its parcel for $7 million to Opportunities and Gemstar agreed to sell its parcel for $3 mil-

lion to Opportunities. The terms of the agreements were that Opportunities would pay $500 down on each parcel, with the balances and 10% interest due on October 1, 1981; the seller corporations remained responsible for mortgage payments and other expenses. Villanueva advised Ziggy to have the operative legal documents necessary to transfer and record title drawn up by a lawyer.

Ziggy presented the agreements of sale to the shareholders and told them they needed to sign them to retain their tax benefits; nevertheless, he assured them orally that their original arrangement to "share and share alike" was still in effect, although the documents of sale did not reflect that fact.

Villanueva subsequently drafted several modifications of the original agreements of sale, by which the shareholders effectively agreed to waive the corporations' right to interest already earned, and extended the due dates on the balances for another year with each modification.

In early 1983, the properties were transferred into Ziggy's subdivision trusts, for which Villanueva prepared the necessary calculations, with the corporations named as first beneficiaries to receive a minimum release price as the subdivided properties were sold by Opportunities. Unknown to the shareholders, Ziggy also utilized junior trusts to subsequently transfer the properties from Opportunities to third party buyers at a substantial profit. The corporations were ultimately paid the balance of the $10 million sales price and approximately $8 million in net profits were distributed to the shareholders. The shareholders later learned, apparently in February 1986, that Ziggy had made additional profit of approximately $4.3 million from the subsequent sales of the properties, and that profit was not proportionately shared with the other shareholders of Gemstar and Canstar. Plaintiffs sued Ziggy and Opportunities for breach of contract and breach of fiduciary duties, and were awarded a judgment, after jury trial, totalling $4.3 million.

The present suit was filed in September 1989, alleging that Villanueva failed to warn

the plaintiffs of the true consequences of the 1980 agreements of sale, that he knew the true value of the parcels had appreciated significantly by the time they were transferred to the subdivision trusts, and that he knew of and assisted in Ziggy's "looting" from the corporations the excess profits from the subsequent sale of the properties in 1983 and 1984. Plaintiffs also alleged that Villanueva assisted Ziggy in orchestrating a shareholder meeting designed to cover-up Ziggy's activities and to obtain "an ill-informed and a belated ratification of Ziggy's activities."

Plaintiffs sought recovery against defendants under several theories, and ultimately prevailed at trial on their claims of accounting negligence, breach of contract, breach of fiduciary duties, and substantial assistance in Ziggy's breach of fiduciary duties. Defendants appeal from the judgment in plaintiffs' favor totalling more than $4 million.

## DISCUSSION

### Plaintiffs' Capacity to Sue

Defendants contend that the trial court erred in failing to direct a verdict on all claims, based on the shareholders' incapacity to sue either individually or derivatively and the inability of the corporate plaintiffs to retroactively ratify the actions of the shareholders after the statutes of limitations had run on the corporate claims. Plaintiffs respond that the individual shareholders could sue in their individual capacities on the contract claim as beneficiaries of the corporate contracts with defendants and on the tort claims as foreseeable plaintiffs. They also argue that the corporations, retroactively restored to their legal status at the time the complaint was filed, did not need to formally ratify the shareholders' actions in order to maintain this suit.[3] This issue arose in several different contexts throughout the course of this litigation, which are described below.

#### a. Procedural Background of Capacity Arguments

In their complaint, the shareholders purported to bring the action "(i) individually, (ii) as surviving shareholders of and/or (iii) on behalf of Gemstar and Canstar." Additionally, the complaint named plaintiffs Gemstar and Canstar as "lapsed" British Virgin Island corporations (B.V.I.).

In a pretrial motion for partial summary judgment, defendants argued that "neither defunct corporations nor their former shareholders have the requisite legal capacity to bring an action for monetary injury suffered by the corporations," because (1) at the time the complaint was filed, the corporations did not exist as legal entities in the B.V.I., because their failure to pay license fees resulted in their names being stricken from the Register of Companies; and (2) under British law, which governs the capacity of a B.V.I. corporation to sue, the shareholders had no individual or derivative standing.

Plaintiffs responded that (1) the corporations had paid their fees, thus restoring their standing retroactively to the date their names had been stricken; and (2) even if restoration had not occurred, the shareholders had the right to sue both as surviving shareholders under A.R.S. § 10–105, and individually under Arizona tort law as foreseeable plaintiffs. Regarding the issue of the capacity of the corporations to sue, both parties submitted sources of British Virgin Island law in the forms of expert affidavits.[4]

---

**3.** Plaintiffs also argue that this defense was waived by defendants' failure to preserve it in a verified answer as required by Rule 9(i), Arizona Rules of Civil Procedure. However, this defect was cured by the trial court's granting of defendants' motion to verify their answer on September 9, 1991. Additionally, plaintiffs' contention that defendants failed to disclose this defense is not supported by the record.

**4.** The expert affidavits were submitted under authority of Rule 44.1, Arizona Rules of Civil Procedure, which permits the submission of any rele-

vant source of foreign law. The substance of those affidavits is discussed more fully *infra*.

At oral argument in this court, plaintiffs' counsel represented several times to this court that the only testimony before the trial court regarding the substance of B.V.I. law came from their foreign law expert, Jay I. Bartz. However, the record clearly discloses that, in their reply in support of their motion for summary judgment regarding the lack of capacity defense, filed in the trial court on July 22, 1991, defendants included a detailed affidavit from their foreign law expert, Sydney A. Bennett, a barrister and solici-

After a hearing on the motion,[5] the trial court ruled as follows:

> The issue before this Court is a relatively narrow one: May the shareholders of a corporation sue the corporation's CPA for the CPA's professional negligence and the CPA's breach of fiduciary duty?
>
> ... [I]t appears that the Defendant, Villanueva, communicated only directly with Mr. Wauro, the corporate officer responsible for such day to day business as dealing with the company's CPA, although Mr. Villanueva met at least two of the shareholders other than Mr. Wauro.
>
> There are some facts (although not many) which demonstrate that Mr. Villanueva gave "direct advice to shareholders." ... Even if that evidence was absent or even if it would not meet the *Orme School* ... test, there are substantial inferences which can be drawn without stretching one's imagination which indicate that Mr. Villanueva knew that Mr. Wauro was giving to the other shareholders the advice and information which he, Villanueva, was giving to Wauro....
>
> Although Defendants properly cite the general rule that a corporation, not its shareholders, must sue a tortfeasor for harm to a corporation, there are exceptions and distinctions. One distinction is expressed in § 552 of the Restatement (Second) of Torts, which is cited with approval by Chief Justice Gordon in *Donnelly Const. Co. v. Oberg/Hunt/Gilleland,* 139 Ariz. 184, 677 P.2d 1292 (1984).... [quote of Restatement section omitted].
>
> Clearly the facts here create a triable issue as to whether the individual Plaintiffs were "foreseeable" and whether Villanueva knew that Mr. Wauro intended to supply the information to the Plaintiffs.
>
> Furthermore, as with other professionals, there have recently been dramatic changes in the standards applicable to the duty of care owned by accountants.... [citations omitted]
>
> This is not to say that every time a CPA gives negligent advice to a corporation, every shareholder can maintain a tort action for the damages he might sustain because the value of his stock declines. Here, we have few shareholders. The information being supplied was allegedly given to prefer Wauro's interest over the other shareholders and would, again allegedly, cause them to act in such a way that Wauro would benefit financially.
>
> ... Without using the words, Defendants are claiming that "lack of privity" precludes these Plaintiffs as individual shareholders. Justice Gordon pronounced the death knell of that antiquated principal in *Donnelly,* supra. In Arizona, accountants are liable for foreseeable injuries to foreseeable victims which proximately result from their negligent performance of their professional services. As espoused in *Fickett v. Superior Court,* 27 Ariz.App. 793, 558 P.2d 988 (1976), where a lawyer's conduct was in issue, it is necessary to balance various factors such as the extent to which the transaction was intended to affect the Plaintiff, the foreseeability of harm to him, the degree of certainty that the Plaintiff suffered injury, the closeness of the connection between the Defendant's conduct and the injuries suffered, the moral blame attached to the Defendant's conduct, and the policy of preventing future harm. When these factors are balanced here, the duty is imposed.

In a supplemental reply, defendants advised the court that they had recently become aware that plaintiffs had held an "extraordinary meeting" on July 11, 1991, after the motion for partial summary judgment regarding lack of capacity to sue had been filed, at which the shareholders had attempted to have the corporations retroactively authorize the filing of the suit. Defendants

---

tor of the Eastern Caribbean Supreme Court, practicing in the B.V.I. That reply also included copies of the relevant case law relied on by Mr. Bennett in his affidavit.

We consider the affidavits of both experts in our discussion regarding the substance of B.V.I. law.

**5.** The transcript of this hearing on August 21, 1991, is not in the record on appeal. However, the trial court entered a detailed ruling in its minute entry on that date, set forth above.

also supplied the court with a copy of the applicable B.V.I. provision that provided for retroactive restoration of the corporations' status upon payment of the license fees.[6] Defendants requested that the court dismiss all claims by the corporations because they took no actions to authorize the lawsuit until after the statutes of limitations had run on the corporate claims.

At a hearing on the supplemental reply, defendants argued (1) that corporate ratification of the suit was ineffective because the statutes of limitations had run on plaintiffs' claims, (2) that, having revived the corporations' standing, plaintiffs had eliminated their right to sue as surviving shareholders, and (3) that the shareholders had no right to sue as individuals because they claimed no harm different from the alleged corporate harm.

In response, plaintiffs argued that the damages suffered by the shareholders were not only those suffered as beneficial owners of the corporations, but also included out-of-pocket expenses they incurred in the form of attorneys' fees and incidental and consequential damages expended in all the litigations which "were necessary and natural consequences of Mr. Villanueva's activities."

The court denied the lack of capacity motion "without prejudice to the defendants to raise this issue at the close of Plaintiffs' case at the time of trial."

The issue arose again when defendants moved for directed verdicts based on their statutes of limitations and capacity motions. On those defenses, the trial court ruled that the shareholder plaintiffs were the "beneficiaries of rights and duties, including contractual duties, which ran between the Defendants and the Plaintiffs," and that "under the authority of § 552 of the Restatement (Second) of Torts, there are jury issues as to whether the individual Plaintiffs were 'foreseeable' and whether the Defendants knew that Mr. Wauro intended to supply the infor-mation to the individual Plaintiffs." The trial court denied the motion for directed verdict, based on the statutes of limitations and capacity.

The trial court also denied defendants' renewed motion after plaintiffs' counsel argued that, although the shareholders did not ratify the lawsuit until 1991, the shareholders had capacity to bring the lawsuit derivatively at the time it was filed. The trial court again denied the motions.

To put this matter in proper prospective, we find the plaintiffs' closing arguments to the jury illuminating:

> This case arises because Ziggy put money in his pocket. *Obviously, if he put the money in the corporations and it was distributed, there would be no damage at all.*
>
> ... [T]here are separate verdict forms of the corporate plaintiffs and for the other plaintiffs.... [W]e're going to get to the magic 60 percent. There's been testimony *all they want is their 60 percent of what Ziggy pocketed, but the corporations are entitled to a judgment here. And you may decide that the corporations are entitled to the full hundred percent.*
>
> . . . .
>
> First, the corporations—because you're going to be having to deal with the corporations first, the testimony was really not impeached that *there was pocketed by Ziggy $4,040,000 that should have gone into the corporations.*
>
> And that's what the corporations are entitled to get back, because what should have gone into their pocket originally they were deprived of and they did not get because of what Ernst & Whinney and Ernst & Young and Villanueva did. And that's the damages that relates to the corporation[s].
>
> . . . .

---

6. The provision is contained in the May 2, 1986, amendment of section 240 of Cap. 243 (Brit.Virgin.Is.Corp.Code), as follows:

*Striking off for failure to pay fee.*

240(2) Where the name of a company has been struck off the register or where its registration has been cancelled for non-payment of the annual license fee, the Registrar may, upon application made to him and subject to payment of the fees set forth in subsection (3), restore the name of the company to the register; and *where the name of a company is so restored, it shall be deemed never to have been struck off the register.*

(Emphasis added.)

Now, what about the individuals?

The individuals are in a different situation in two ways.

Number one, *any judgment in their favor directly should be only 60 percent of the $4 million because that's what individually that they're entitled to.* So the 60 percent of $4 million is $2,424,000.

Number two is they were required to expend 667,800 some odd dollars for attorney's fees in the Wauro case. And you will see in connection with all of the—each claim has the same element of damages.... One, monetary losses which are the amounts received by [Ziggy] and his companies from the sale of Gemstar and Canstar's real estate assets. That's the four million and 60 percent of it.

And reasonable sums for legal fees and costs incurred in plaintiff's lawsuit against [Ziggy] if you find that as a result of the defendant's conduct it was necessary for plaintiffs to file that lawsuit.

. . . .

And so what we ask you—that if you do find in favor of the plaintiffs, if you fill in the amount for the corporation of $4 million, and *if you do find in favor of the plaintiff shareholders that you fill in the amount of $3 million, which, rounded, consists of the 2.4 which is the 60 percent of the 4 million, plus their $600,000 of legal fees in the Wauro lawsuit.*

(Emphasis added.)

After being instructed and beginning deliberations, the jury sent the following questions to the trial judge:

Why are separate judgments required for the corporations and shareholders? Aren't they one [and] the same? Is this clarified in the instructions?

After discussing the matter with counsel, the trial judge responded:

There are legal reasons for the separate judgments. You should reread all of the jury instructions.

After almost a full day of deliberations, the jury returned its verdicts, awarding the corporate plaintiffs and the shareholder plaintiffs equal amounts of damages on each claim.

The issue of the shareholders' standing was again raised in defendants' motion for judgment notwithstanding the verdict. They further argued that the corporate claims were barred because the corporations' ratification of the lawsuit on July 11, 1991, occurred after the statutes of limitations had run on all claims, even under plaintiffs' theory of when the claims accrued. The trial court again denied defendants' motion, relying on the reasons previously set forth in the record.

### b. *Analysis: Shareholders' Capacity to Sue*

The parties agree that the issue of plaintiffs' capacity or standing to sue is a question of law, which this court determines *de novo*. *See generally City of Scottsdale v. Thomas,* 156 Ariz. 551, 552, 753 P.2d 1207, 1208 (App. 1988) (appellate court is not bound by trial court's conclusions of law). Additionally, the parties appear to agree, although we are not bound to that agreement, that the substantive law of the British Virgin Islands, as the place of incorporation, governs issues regarding the corporations' legal existence and capacity to sue. *See generally Restatement (Second) of Conflict of Laws,* Ch. 13, especially §§ 296 and 299 (1971) (corporate existence and capacity to sue are determined by laws of its place of incorporation). This court "can arrive at a resolution of the foreign law question on the basis of its own independent research and analysis." *Kadota v. Hosogai,* 125 Ariz. 131, 136, 608 P.2d 68, 73 (App.1980). However, we are "not required to undertake the burden of researching and determining foreign law without any assistance from the attorneys." *Id.* In this case, to the extent our resolution rests on an understanding of B.V.I. law, we have examined the parties' expert affidavits submitted to the trial court under authority of Rule 44.1, Arizona Rules of Civil Procedure. *See* note 4, *supra.*

Plaintiffs submitted the affidavit of Jay I. Bartz, an international law expert, who testified, in relevant part:

1. ... [U]nder B.V.I. law a company whose name is struck off the Register of

Companies is not thereby "dissolved"; rather, the company continues to exist and has the power to resume its business as a going B.V.I. concern as if it had never been struck off by having its name restored to the B.V.I. Register of Companies through the payment of annual license fees, annual return fees, penalties and reinstatement fees;

. . . .

3. The members of a B.V.I. company formed under Section 243 of the Companies Act are possessed of and may bring whatever individual tort actions they may have against company officers and agents as are permitted by the jurisdiction in which suit is brought. There is nothing under B.V.I. law which restricts such actions.

Defendants submitted the affidavit of Sydney A. Bennett, Barrister and Solicitor of the Eastern Caribbean Supreme Court since 1980, currently practicing in the B.V.I., who testified in relevant part:

(a) It is a fundamental principle of corporate law in force in the British Virgin Islands that a company is a legal person having a separate existence from that of its members.

(b) It is a further fundamental principle of English law and indeed, of the law in force in the British Virgin Islands that a person cannot as a general rule bring an action on behalf of another person to seek redress for that person in respect of wrongs done to that person by a third person.

(c) It therefore follows that in any action to redress a wrong done to a company or to recover money or damages alleged to be due to it, the company is the only proper plaintiff and any such action must be carried out in the name of that company.

The forementioned principles when applied to corporations are collectively referred to as the rule in **Foss v. Harbottle,** and the circumstances in which that rule is applied by the Courts were described . . . in the case of **Prudential Assurance Co. Ltd. v. Newman Industries Ltd. and others (No. 2) (1982) 1 All ER 354 CA.** . . .

(d) A further consequence of the fact that a company has a separate legal identity from its members is the principle that no shareholder has any right to seek any personal remedy in respect of any loss occasioned by or in consequence of any wrong done to a company. This principle was discussed and applied by the English Court of Appeal in the case of **Prudential Assurance Co. Ltd. v. Newman Industries Ltd. and Others (No. 2) (supra)** . . . .

. . . .

6. The name of the company may only be used as plaintiff by the direction of the company or its directors and company's name will be struck out as plaintiff in any action instituted in its name without such authorisation. This principle is illustrated by the case of **La Compagnie De Mayville v. Whitley (1896) 1 Ch 788** . . . .

7. Further, in my opinion one of the effects of the registration of a company under the **Companies Act Cap. 243** is to grant to a company the power to sue and be sued in its own name and the entire point and purpose of the striking of a company from the register is to put an end to the exercise by that company and of the privileges and benefits of incorporation such as the right to so conduct litigation. A company the name of which has been struck from the register is not competent to carry on litigation. **Section 240(2)** of that act allows the company to apply to be restored to the register and upon such restoration the company is deemed never to have been struck off. The retroactive effect of such restoration is to validate whatever acts the company may have carried out in the period that it was struck off, so that litigation commenced in that period would be retroactively made valid. . . .

Based on our understanding of B.V.I. law from these sources, we conclude that we are not required to find, as a preliminary matter, whether B.V.I. law or Arizona law applies to this capacity determination, because we find no significant difference between those laws in the context of this case. *See, e.g., Baroldy v. Ortho Pharmaceutical Corp.,* 157 Ariz.

**156**

574, 578, 760 P.2d 574, 578 (App.1989) (choice of law analysis begins with a determination that laws of the two jurisdiction differ in relevant applications).

■ Plaintiffs' theory of damages, articulated under the accounting negligence, breach of contract, and breach of fiduciary duty claims, was that defendants assisted in a business transaction by which Ziggy diverted approximately $4 million in profits which belonged to the corporate plaintiffs and which should have been distributed among the shareholder plaintiffs in proportion to their shares of stock ownership. Under this damages theory, the corporations and their shareholders suffered an identical wrong: a loss of profits from defendants' participation in Ziggy's failure to abide by the "share and share alike" agreement. Indeed, even the jury could not perceive a difference between the corporate and shareholder plaintiffs' positions on damages.

■ The virtually universal general rule is that an individual shareholder lacks standing to sue for recovery of individual damages for which the shareholder would otherwise have a cause of action when those damages arose solely from acts that caused identical injuries to the corporation, and thus proportionately reduced the value of the individual's shares. *See generally* 12B *Fletcher Cyclopedia of the Law of Private Corporations* § 5911 at 483–84 (1993 Rev.Vol.) ("If the wrong is primarily against the corporation, the redress for it must be sought by the corporation, except where a derivative action by a shareholder is allowable, and a shareholder cannot sue as an individual"). This is the rule in the British Virgin Islands, as set forth in *Prudential Assurance Co. Ltd.:*

> But what [a shareholder] cannot do is to recover damages merely because the company in which he is interested has suffered damage. He cannot recover a sum equal to the diminution in the market value of his shares, or equal to the likely diminution in dividend, for such a "loss" is merely a reflection of the loss suffered by the company. The shareholder does not suffer any personal loss. His only "loss" is through the company, in the diminution in the value of the net assets of the company,

in which he has (say) a 3% shareholding. The plaintiffs' shares are merely a right of participation in the company on the terms of the articles of association. The shares themselves, his right of participation, are not directly affected by the wrong doing. The plaintiff still holds all the shares as his own absolutely unencumbered property. The deceit practiced on the plaintiff does not affect the shares; it merely enables the defendant to rob the company.... A personal action would subvert the rule in *Foss v. Harbottle* and that rule is not merely a tiresome procedural obstacle placed in the path of a shareholder by a legalistic judiciary. The rule is the consequence of the fact that a corporation is a separate legal entity.... When the shareholder acquires a share he accepts the fact that the value of his investment follows the fortunes of the company and that he can only exercise his influence over the fortunes of the company by the exercise of his voting rights in general meeting.

1 All E.R. at 366–67, as cited in Bennett's Affidavit. This is also the rule in Arizona:

> "When there are numerous shareholders, it is apparent that each suffers relatively, depending upon the number of shares he owns, the same damage as all the others, and that each will be made whole if the corporation obtains restitution or compensation from the wrongdoer. Obviously it is sound policy to require a single action to be brought by the corporation, rather than to permit separate suits by each shareholder. In logic the result is justified, because the only right of the shareholder which has been infringed is what may be called his derivative or corporate right. Having decided to conduct their business in a corporate form, the men behind the corporation have, in the phrase of Justice Holmes, 'interposed a nonconductor' between themselves and those who deal with them in their corporate enterprise.... Even when all the stock is owned by a sole shareholder, there seems no adequate reason to depart from the general rule that the corporation and its shareholders are to be treated as distinct legal persons. Therefore, even a sole

shareholder has no independent right which is violated by trespass upon or conversion of the corporation's property. Only his 'corporate rights' have been invaded, and consequently he cannot sue the tortfeasor in an action at law."

*Hidalgo v. McCauley,* 50 Ariz. 178, 182–83, 70 P.2d 443, 445 (1937), *quoting Green v. Victor Talking Machine Co.,* 24 F.2d 378 (2d Cir.), *cert. denied,* 278 U.S. 602, 49 S.Ct. 9, 73 L.Ed. 530 (1928); *see also Johnson v. Gilbert,* 127 Ariz. 410, 412, 621 P.2d 916, 918 (App.1980) ("[g]enerally, a stockholder may not bring an action in his own right, for such an action would authorize multitudinous litigation and ignore the corporate entity"); *Schroeder v. Hudgins,* 142 Ariz. 395, 398, 690 P.2d 114, 117 (App.1984) ("even where all the stock in a corporation is owned by a sole shareholder, he may not maintain an action individually for wrongs against the corporation").

██ We note that several exceptions to this general rule exist in Arizona and elsewhere. First, if the relationship between the shareholder and the tortfeasor is independent and separate from the interest the shareholder derives from ownership in the corporation, the shareholder may have a personal right of action. *Schroeder,* 142 Ariz. at 398, 690 P.2d at 117. Other exceptions have been recognized when (1) the wrongdoer owes a duty to the individuals other than as shareholders; or (2) the wrongs were sustained only by the individual shareholders rather than the corporate entities. *Williams v. Mordkofsky,* 901 F.2d 158, 164 (D.C.Cir. 1990); *see also Fletcher Cyclopedia, supra,* § 5911 at 484. Additionally, some courts have applied a limited exception to the general rule when a close corporation shareholder sues directly rather than derivatively, or when shareholders who own all the stock of a close corporation proceed against each other. *See generally Fletcher Cyclopedia, supra,* § 5911.50 at 497; *see also Johnson v. Gilbert,* 127 Ariz. at 412, 621 P.2d at 918.

However, plaintiffs have not defended their position and the trial court's ruling on the basis of any of these exceptions on appeal. Plaintiffs' justification for the right of the individual shareholders to sue is the trial court's twofold conclusions that, in Arizona, (1) accountants are liable for foreseeable injuries to foreseeable victims that are proximately caused by their accounting malpractice, and (2) that the shareholders were third party beneficiaries of the contract between defendants and the corporate plaintiffs.

We agree with the trial court's conclusion that the scope of third party professional liability is expanding as courts recognize the duties owed to victims who are not in privity with the tortfeasor. *See Donnelly Const. Co. v. Oberg/Hunt/Gilleland,* 139 Ariz. 184, 677 P.2d 1292 (1984) (professional may be liable to foreseeable victims of their negligence without a requirement of privity); *see also Fickett v. Superior Court,* 27 Ariz.App. 793, 558 P.2d 988 (1976) (attorney's duty of care in performing legal services for the client extends to the intended beneficiary); *H. Rosenblum, Inc. v. Adler,* 93 N.J. 324, 461 A.2d 138 (1983) (duty of independent auditor who furnishes an opinion to company extends to those reasonably foreseeable recipients who use the opinion for its proper business purpose, including potential investors and creditors); *Citizens State Bank v. Timm, Schmidt & Co.,* 113 Wis.2d 376, 335 N.W.2d 361 (1983) (accountant may be held liable for negligent preparation of an audit report if injury to non-privity creditor was foreseeable); *see generally Restatement (Second) of Torts* § 552 (1977) (a professional who supplies false information for guidance of others in their business transactions is liable for pecuniary loss caused by reasonable reliance of those to whom he knows the recipient intends to supply it); Romualdo P. Eclavea, Annotation, *Liability of Independent Accountant to Investors or Shareholders,* 35 A.L.R.4th 225 (1985) (generally noting the trend away from limiting liability to those in privity with accountants).

However, recognizing that liability no longer depends upon privity does not answer the question of who has standing to sue for an injury to a corporate entity. Thus, none of these cases negates defendants' basic position regarding the lack of capacity of the individual shareholders to sue for corporate injuries. Likewise, the Rule 44.1 testimony of plaintiffs' international law expert, that

members of a B.V.I. company are not precluded from bringing individual tort claims against company officers and agents "as are permitted by the jurisdiction in which suit is brought," is not conclusive on this issue either.

Courts that have considered the dual issues of whether a professional defendant has a duty based on the foreseeability of injury to a non-privity plaintiff, and whether that foreseeable plaintiff is the proper party to bring the suit as an individual shareholder where the only injury suffered is by the corporation, have continued to follow the general corporate rule that a shareholder does not have standing to bring suit for a corporate injury. *See, e.g., Hunter v. Knight, Vale and Gregory,* 18 Wash.App. 640, 571 P.2d 212, 216 (1977) (stockholders could not sue accountant for corporate injury regardless of existence of accountant's duty to exercise care towards them as foreseeable beneficiaries of the contractual obligation with the corporation); *Williams,* 901 F.2d 158 (shareholders were precluded from suing attorney for malpractice in failing to obtain corporate FCC license, even though shareholders were, the intended beneficiaries of the representation; damages flowed from loss of corporate opportunity, so shareholders failed to allege cognizable injury as individuals); *Sparling v. Hoffman Constr. Co.,* 864 F.2d 635, 640 (9th Cir.1988) (even if individual shareholders have stated a cause of action to assert a federal RICO claim, they have no standing to sue where the harm is based on injuries to the corporation (citing unanimous precedent in the first, second, fifth, and sixth circuits)).

The *Hunter* court reasoned:

Today it is generally recognized that a duty to exercise due care toward third persons in the performance of a contractual undertaking may arise independent of the contractual obligation.... Whether [the accounting firm] owed plaintiffs a duty independently of, or concurrently with, its contract with [the corporation] is a question of foreseeability.... It is not entirely unreasonable to say that an accounting firm which negligently performs financial audits for a corporation could foresee injury to that corporation's managing stockholders in addition to injury to the corporation.

For purposes of this opinion, however, we need not resolve that issue. Assuming (but certainly not deciding) that [the accounting firm] owed plaintiffs a special duty in addition to the duty to the corporation, *that additional or special duty attached only by reason of plaintiffs' status as stockholders and not from circumstances independent of their status as stockholders.* As an exception to the general rule, a stockholder may maintain an action in his own right against a third party (although the corporation may likewise have a cause of action for the same wrong) when the injury to the individual resulted from the violation of some special duty owed to the stockholder but only when that special duty had its origin in circumstances independent of the stockholder's status as a stockholder.... That independent origin is nonexistent in the case at bench.

571 P.2d at 216 (emphasis added) (citations omitted). Similarly, in the case of attorney malpractice, the *Williams* court ruled:

The District of Columbia has dispensed with the doctrine that third parties are barred for lack of privity from suing attorneys.... The third party, however, must allege more than mere harm from the conduct in question. He must show in addition that he was "the direct and intended beneficiary of the attorney-client relationship." ...

... We agree with the court that the existence of an attorney-client relationship normally is a question of fact, so that a genuine dispute would require resolution at trial.... We further agree that the question whether the [plaintiffs] were ever clients of [defendant] does not require resolution, since they fail to allege cognizable injury as individuals.

The court found that the [plaintiffs] did not suffer cognizable injury because they failed to allege injury as individuals, but instead only as shareholders of [the corporation]. We have held that, under normal circumstances, stockholders may sue for

corporate injury only on a derivative basis, ... but that special injuries will provide grounds for an individual suit. ...

The special injury alleged by [plaintiffs] is loss of business opportunity due to the failed television application. That allegation is meritless. The [plaintiffs] chose to apply for the license through the corporate form of [the corporation]. The business opportunity thus belonged to [the corporation] and the [plaintiffs'] losses were derivative. Had [the corporation] declared bankruptcy, it is certain that [the plaintiffs] would not be so quick to request that we disregard the corporate ·form.

901 F.2d at 164.

We find this reasoning compelling. Regardless of the trial court's finding of a duty owed the shareholder plaintiffs because of the foreseeability of injury to them through defendants' accounting services, and regardless of the conclusion that they were the intended beneficiaries of defendants' contractual obligations to the corporations—findings we need not review for purposes of this opinion—the fact remains that, under the generally accepted corporate law of both Arizona and the British Virgin Islands, they had no cognizable, individual injury from defendants' alleged wrongdoing, apart from the injuries they suffered as shareholders. The damages they seek to recover from those claims are nothing more than the corporate profits they claim were diverted as a result of defendants' conduct. The "share and share alike" agreement they seek to enforce would result in those profits being channeled through the corporations to the shareholders by virtue of their proportionate corporate ownership. Because the damages suffered by the corporations and the shareholders are identical, the shareholders had no standing to sue individually on their claims of accounting negligence, breach of fiduciary duty, or breach of contract. Because plaintiffs could not pursue these claims in their capacity as individual shareholders as a matter of law, we vacate the judgments entered in their behalf on those claims.

■ The one remaining claim, substantial assistance in Ziggy's breach of fiduciary duty,[7] is the only claim under which the shareholders sought to recover damages they had alleged to have suffered individually, that is, the attorneys' fees and costs incurred in pursuing the *Wauro* litigation. That one claim, for approximately $600,000, is the only item sought to be awarded to reimburse the personal expenses of the plaintiff shareholders rather than the corporation. To the extent that the individual shareholders wish to pursue that claim on remand, they may do so.[8]

### c. *Analysis: Capacity of Corporations to Sue*

We turn now to the corporate claims and judgments. Defendants argue that the corporate claims were likewise barred because corporate ratification of the shareholders' complaint occurred after the statutes of limitations had run on all of these claims. Plaintiffs do not directly address this issue; rather, they argue that the date of ratification is

---

7. This claim is based on *Restatement (Second) of Torts* § 876(b), which provides:
   For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he ...
   (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself. ...
   This claim was not alleged in the complaint, but the trial court subsequently allowed it to be submitted to the jury as supported by the evidence. This determination may have been based on an erroneous understanding of the parties' capacities to raise this claim. We therefore express no opinion whether the evidence presented at the prior trial supported the jury's determination of liability on this claim.

8. It appears that the jury did not award the shareholder plaintiffs the individual damages for $600,000 in attorneys' fees that they sought on this claim. The verdicts indicate that the jury awarded both the shareholders and the corporations $1,500,000 on the substantial assistance claim. We cannot tell what portion of this award included impermissible damages for those corporate losses the shareholders had no standing to assert. We therefore vacate the judgment on this claim as well. On remand, the shareholder plaintiffs may seek only the expenses of the *Wauro* litigation that were not paid through the corporations, but were incurred individually without reimbursement from the corporate entities.

irrelevant, because "the lawsuit was authorized and filed by the Shareholders for and on behalf of the Companies ...," and that, because restoration of the corporate status under B.V.I. law was retroactive to the date of the filing of the complaint, no post-restoration ratification was necessary.

■ We first address the issue of an untimely ratification. The following dates are relevant to this issue. The corporations were incorporated in B.V.I. on February 20, 1979. It is undisputed that on January 4, 1988, the corporate names were stricken from the B.V.I. Register of Companies for failure to pay the annual license fees. Approximately 22 months after the corporations had lapsed, on September 26, 1989, plaintiffs filed this lawsuit. Plaintiffs do not dispute that the shareholders' only official action to ratify the corporate lawsuit occurred at the extraordinary meeting on July 11, 1991, after all statutes of limitations had run on all claims, under either of the parties' theories.

Plaintiffs' contention in their answering brief that "the ratification argument is actually a thinly-disguised attack on the sufficiency of the evidence to support the jury's verdict on the statute of limitations questions" is unfounded. The statute of limitations question presented to the jury raised only the issue whether the September 1989 complaint was timely filed, and not whether the July 1991 ratification occurred within the required period to sue. Plaintiffs have not argued, either in the trial court or on appeal, that the July 1991 ratification occurred within the applicable statutes of limitations on these claims.[9]

Furthermore, plaintiffs do not contest defendants' legal premise that a ratification of the lawsuit cannot relate back to the filing of the suit when the ratification occurs after the statutes of limitations have run. Indeed, we find this premise supported by well-recognized authority. For example, *Restatement (Second) of Agency* § 90 provides:

> If an act to be effective in creating a right against another or to deprive him of a right must be performed before a specific time, an affirmance is not effective against the other unless made before such time.

As comment a to § 90 explains:

> The bringing of an action ... by a purported agent can not be ratified after the cause of action ... has been terminated by lapse of time.... [I]f another has acquired a defense against an action by the principal, the right or defense can not be destroyed by ratification.

Thus, an affirmance or ratification will be effective only if it "comes before a statute of limitations has run on the claim." *Id.* at comment c. We therefore conclude that the July 11, 1991, ratification was ineffective to validate the shareholders' suit filed in 1989 on behalf of the corporations.

The question then remains whether any other legal basis exists for the shareholders' suit brought "for or on behalf" of the corporate plaintiffs. We conclude there is no such basis.

In this case, both parties have presented evidence that, under B.V.I. law, the restoration of the corporations in July 1991 was retroactive to before the filing of the complaint; thus, any litigation commenced by the corporations during that time "would be retroactively made valid," according to defendants' expert foreign law affidavit, and the corporations would be retroactively vested with "the power to resume its business as a going B.V.I. concern as if it had never been

---

9. In response to questioning at oral argument in this court, however, plaintiffs' counsel contended that, because a six-year statute of limitations applied to the breach of contract claim from the alleged "discovery" of the breach in June 1988, ratification of the suit on that basis was timely. However, counsel was unable to provide this court with any authority that the "discovery" rule applied to the written contract claim based on the engagement letter, and was further unable to persuade this court that this claim would not be governed by a three-year statute of limitations applicable to an oral extension of a 1981 written contract. *See generally* A.R.S. § 12-543.

Because it is not necessary to our analysis, we need not decide when the various statutes of limitations actually ran in this case. Indeed, the parties do not present that issue in this appeal. Because plaintiffs did not argue the ratification issue in this context in the trial court and have not briefed it in terms of the statutes of limitations in this court, we find they have waived any argument that ratification occurred within the statutes of limitations periods.

struck off," according to plaintiffs' expert affidavit. The effect of this restoration is that, anytime before the statutes of limitations had run, the corporations in their own right could have brought suit.[10] However, they did not do so and, as we have held, the attempted ratification after the statutes of limitations had run was ineffective.

We therefore examine plaintiffs' contention that this suit was validly brought on the date it was filed, within the statutes of limitations, because the shareholders brought it on behalf of the retroactively restored corporations. Because the restoration reactivated the corporations' right to maintain their suits, this scenario is valid only if the shareholders were seeking recovery for the corporations on a derivative basis. *See, e.g., Funk v. Spalding,* 74 Ariz. 219, 225, 246 P.2d 184, 188 (1952) (if corporation is an ongoing concern at time of suit, shareholder can maintain action to recover corporate profits only in a representative capacity in a derivative suit); *see also* Rule 23.1, Arizona Rules of Civil Procedure. Plaintiffs have not argued on appeal, however, their initial position in the trial court that they had standing to bring this suit in a derivative capacity or as surviving shareholders. In examining this issue here, we merely note that, at this point, any argument that they were "surviving shareholders" under A.R.S. § 10–105 of a "dissolved" or "liquidated" corporation at the

time the suit was brought would be inconsistent with their actions in reviving the "lapsed" corporate entities retroactively. Furthermore, we find no evidence on this record that plaintiffs met the procedural notice requirements of Rule 23.1, Arizona Rules of Civil Procedure,[11] to obtain such a representative standing, nor did they base their suit on one of the three exceptions allowing a derivative suit under B.V.I. law. *See generally Prudential Assurance Co. Ltd.,* 2 All E.R. at 861, *citing Edwards v. Halliwell,* (1950) 2 All E.R. 1064 at 1066–67 (derivative claims may be brought (1) where minority shareholders attempt to prevent or recover for *ultra vires* acts; (2) where shareholders seek to have an action declared void because a special resolution is required; or (3) where what has been done amounts to a fraud on the minority and suit is against wrongdoers who are in control of the company).

We conclude that plaintiffs have not established capacity to sue on behalf of the corporations, nor have they established any action by the corporations, either at the time the suit was filed or within the time to sue, that would retroactively authorize either a direct or derivative suit on behalf of the corporations on any of these claims. Because the shareholders have not established such standing, the judgments in favor of the corporations must also be vacated. Because we

---

10. We note that if the shareholders had taken the same official action to authorize the lawsuit at the time they filed it in September 1989 as they did to ratify it in July 1991, the retroactive restoration of the corporate status might have given them a basis to sue on behalf of the corporations within the statutes of limitations. However, no evidence of such an action is present in this record, and plaintiffs do not argue that it occurred.

11. Rule 23.1, Arizona Rules of Civil Procedure, provides for shareholders to bring derivative suits on behalf of a corporation under the following conditions:

In a derivative suit brought by one or more shareholders or members to enforce a right of a corporation or of an unincorporated association, the corporation or association having failed to enforce a right which may properly be asserted by it, the complaint shall be verified and shall allege that the plaintiff was a shareholder or member at the time of the transaction of which the plaintiff complains.... *The complaint shall also allege with particularity*

*the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for the plaintiff's failure to obtain the action or for not making the effort. ...*
(Emphasis added.)

In this case, plaintiffs have provided no evidence of any demand they made of the directors to sue the defendants, or that such demand was refused. They have not pled with particularity their reasons for not making such a demand, or for not calling a formal meeting of the shareholders, of which plaintiffs were a majority, to authorize the lawsuit at the time it was filed. The only relevant allegations in the complaint were that the corporations were "lapsed" and that they were currently in litigation with Ziggy and were "unable to obtain the action Gemstar and Canstar desire from him." Plaintiffs do not argue that this is sufficient procedural notice of a derivative lawsuit, and we do not find that it meets the requirements of Rule 23.1.

have previously concluded the shareholders did not have individual capacity to sue for any claim other than the substantial assistance claim for attorneys' fees and costs incurred in the *Wauro* litigation, all other claims in this action must be dismissed as a matter of law.

For the foregoing reasons, the judgment of the trial court is reversed, and this matter is remanded for proceedings consistent with this opinion. Each party is to bear its own attorneys' fees.

CONTRERAS and TOCI, JJ., concur.