917 P.2d 222

**GEMSTAR LIMITED, a British Virgin Islands corporation; Canstar Limited, a British Virgin Islands corporation; Kunst Corporation, Inc., a corporation; R. Pape Corporation, Inc., a corporation; Richard Holding, a corporation; H.K. Bergmann, Inc., a corporation; Kittan, Inc., a corporation; and James R. Tomasini, Plaintiffs–Appellees,**

v.

**ERNST & YOUNG, fka Ernst & Whinney, a partnership; Edward A. Villanueva and Lynn Villanueva, husband and wife, Defendants–Appellants.**

No. CV–95–0186–PR.

Supreme Court of Arizona,
En Banc.

May 7, 1996.

Broening, Oberg, Woods, Wilson & Cass, P.C. by Kevin T. Ahern, Copple, Chamberlin & Boehm, P.C. by Scott E. Boehm, Phoenix, for Appellees.

Streich Lang by William S. Hawgood, II, Karen A. Potts, Phoenix, Ernst & Young, L.L.P. by Stephen N. Young, Los Angeles, CA, Kathryn A. Oberly, Washington, D.C., Emmett E. Eagan, Jr., Washington, D.C., for Appellants.

Gammage & Burnham by Grady Gammage, Jr., Phoenix, for Amicus Curiae Arizona Society of Certified Public Accountants.

## OPINION

ROBERT J. CORCORAN, Justice (Retired).

This case is one of three lawsuits involving the purchase and resale of two Arizona real properties. Plaintiffs are two British Virgin Islands (B.V.I.) corporations, Gemstar Limited and Canstar Limited, and 6 of the corporations' original 8 shareholders. The 6 plaintiff shareholders are 5 closely held corporations and one individual: (1) Kunst Corporation (principal Adam Kunst); (2) R. Pape Corporation (principal Adam Kunst); (3) H.K. Bergmann, Inc. (principal Herbert Bergmann); (4) Kittan, Inc. (principal Kurt Kittan); (5) Richard Holding, Inc. (principal Joseph Stangl); and (6) James Tomasini. We will refer to these as the individual shareholders. Defendants are Ernst & Young (formerly known as Ernst & Whinney), Edward Villanueva (an accountant with Ernst & Young), and Lynn Villanueva, his wife.

Plaintiffs' suit went to the jury on claims of breach of contract, professional negligence, breach of fiduciary duty, and substantial assistance of another's breach of fiduciary duty. Plaintiffs alleged that the individual shareholders had capacity to sue individually and derivatively, as shareholders of Gemstar and Canstar, and that Gemstar and Canstar had capacity to sue directly. After a lengthy trial, the jury returned separate verdicts for the individual shareholders and Gemstar and Canstar on all four claims. The trial court then entered a damage award of $2.4 million and added prejudgment interest, attorneys' fees, and costs, for a total judgment of $4,258,768.47.

Defendants appealed, raising numerous issues. The court of appeals reversed the trial court's judgment, finding that: (1) the individual shareholders lacked capacity to sue individually on the breach of contract, professional negligence, and breach of fiduciary duty claims because the damages they sought to recover were corporate, rather than individual, in nature; (2) the individual shareholders lacked capacity to sue derivatively on all four claims because they did not satisfy the procedural requirements, under either Arizona or B.V.I. law, for bringing a derivative suit; and (3) Gemstar and Canstar lacked capacity to sue on all four claims because the corporations did not authorize the suit when it was filed or later ratify the suit within the applicable statute of limitations periods. *Gemstar Ltd. v. Ernst & Young*, 183 Ariz. 148, 159–61, 901 P.2d 1178, 1189–91 (App.1995). Additionally, the court of appeals found that the individual shareholders had capacity to sue individually on the substantial assistance claim, and it remanded the case for a new trial on that issue. 183 Ariz. at 159, 162, 901 P.2d at 1189, 1192.

Plaintiffs petitioned this court for review of the court of appeals' opinion and presented the other issues defendants raised on appeal, which the court of appeals did not reach. *See* rule 23(c)(2), Arizona Rules of Civil Ap-

pellate Procedure. We granted review and now vacate the court of appeals' opinion on the ground that Gemstar and Canstar have capacity to sue. Because the jury returned separate verdicts in favor of both the individual shareholders and Gemstar and Canstar and because the damages awarded were duplicative, we need not address the individual shareholders' capacity to sue. In addition, to avoid further litigation and delay in this matter, we address the other issues that defendants raised on appeal. We have jurisdiction pursuant to article 6, § 5(3), Arizona Constitution, and rule 23, Arizona Rules of Civil Appellate Procedure.

### Facts and Procedural History

Our resolution of the capacity issue and the other issues defendants raised on appeal does not require a detailed recounting of the facts concerning defendants' alleged misfeasance. We provide a brief discussion of the background facts for context.

Sometime in late 1978 or early 1979, a group of one American and six Canadian investors, including those who later became individual shareholders, and Siegfried Wauro agreed to purchase and later sell two Arizona real properties, which Wauro had located. Wauro was a defendant in the companion case, *Kunst Corp. v. Wauro,* 1 CA–CV 90–0655 (Ariz.App.Mem.Dec. filed July 26, 1994) (the *Wauro* case). The investors agreed to "share and share alike" in the costs and profits associated with the properties in proportion to the amount they invested in the properties.

Most of the investors were friends or business acquaintances, and they originally planned to form a partnership. In February 1979, however, the investors decided to form and become shareholders of two B.V.I. corporations, Gemstar and Canstar, because their tax lawyers had advised them of a United States tax law that allowed foreign corporations passively investing in United States land to avoid capital gains tax. Also in February 1979, Wauro introduced defendant Edward Villanueva, an accountant with defendant Ernst & Young who also had served as Wauro's personal accountant since 1978, to at least two of the other investors. The investors agreed to hire Villanueva to prepare the corporations' tax returns and financial statements.

After Gemstar and Canstar were formed, the investors owned the following percentages of stock in each corporation: the 6 individual shareholders each owned 10%, Wauro owned 30%, and one other individual, who is not a party to this action, owned the final 10%. Gemstar and Canstar each had 5 directors: 3 B.V.I. directors, Siegfried Wauro (who also served as president and treasurer), and Adam Kunst (who also served as vice president). The investors agreed that Wauro would handle the corporations' daily affairs, including any contact with Villanueva, but a written shareholders' agreement provided that the approval of both Wauro and Kunst was required before the corporations could purchase or sell the real properties or redeem any of Gemstar's and Canstar's stock.

Later in 1979, Gemstar and Canstar purchased the two Arizona real properties for a total of $1.4 million. In early 1980, Villanueva informed Wauro that legislation pending in Congress would eliminate the capital gains tax advantage and advised Wauro that the corporations should sell the properties before the new law became effective. Wauro informed the other investors of the potential change in the law and suggested that the corporations sell the properties to Ziggy's Opportunities, a company controlled by Wauro. Wauro suggested this sale because the Arizona real estate market was depressed at the time and the investors were unlikely to find another buyer. The investors agreed to the sale.

When Wauro informed Villanueva of the decision to sell the properties to Ziggy's Opportunities, Villanueva drafted two sale agreements. Under the terms of these agreements, Gemstar and Canstar agreed to sell the properties to Ziggy's Opportunities for a total of $10 million. The agreements provided that Ziggy's Opportunities would pay $500 down for each property, with the balance and 10% interest due on October 1, 1981, and that Gemstar and Canstar remained responsible for the mortgage payments and other expenses related to the

properties. Villanueva later drafted two modifications to the original sales agreements, which waived the corporations' right to interest already earned and extended the due dates on the balances for two years. Although the sales agreements and later modifications did not reflect such, Wauro and plaintiffs orally agreed that the purpose of the sale to Ziggy's Opportunities was only to retain the capital gains tax advantage and that the sale did not modify or terminate the investors' "share and share alike" agreement.

In 1983, Wauro, through Ziggy's Opportunities, began to subdivide and sell the properties, using a series of subdivision and junior subdivision trusts. Ultimately, Wauro sold the properties for a total of $12.3 million, and, of that amount, he distributed $8 million to Gemstar and Canstar, which in turn was distributed to the individual shareholders and to Wauro. Wauro kept for himself the remaining $4.3 million, which he had diverted into undisclosed junior subdivision trusts.

Plaintiffs eventually learned of the diverted profits, and in July 1987, they sued Wauro for breach of contract and breach of fiduciary duties in the *Wauro* case. In September 1990, the jury awarded damages to plaintiffs, and the trial court entered a total judgment of $4,337,994.05 against Wauro. *Kunst Corp. v. Wauro*, 1 CA–CV 90–0655 (Ariz.App.Mem. Dec. filed July 26, 1994). After the judgment was entered, Wauro appealed and filed bankruptcy. The court of appeals affirmed the judgment in part and remanded in part with directions to recompute the damages. We declined review of that decision.

Plaintiffs also sued the corporations' attorneys for malpractice arising out of the real estate transactions. That case settled before trial for $1.25 million. *Gemstar Ltd. v. Goodson*, CV 87–40772 (Maricopa County Superior Court).

During the *Wauro* litigation, plaintiffs learned of Villanueva's role in the purchase and resale transactions, and, in September 1989, they brought this case. Plaintiffs alleged that the individual shareholders had capacity to sue individually and derivatively, as shareholders of Gemstar and Canstar, and that Gemstar and Canstar had capacity to sue directly.

Sometime after filing this suit, plaintiffs learned that Wauro had stopped paying the annual fees required to keep Gemstar and Canstar in good standing under B.V.I. law and that, as a result, Gemstar and Canstar were removed from the B.V.I. register of companies in January 1988. In July 1991, however, plaintiffs paid the necessary fees to restore the corporations under § 240(2), chapter 243, of the B.V.I. Corporate Code, which provides:

> Where the name of a company has been struck off the register or where its registration has been cancelled for non-payment of the annual license fee, the Registrar may, upon application made to him and subject to payment of the fees set forth in subsection (3), restore the name of the company to the register; and *where the name of a company is so restored, it shall be deemed never to have been struck off [the register].*

(Emphasis added.)

Also in July 1991, Adam Kunst, who was a director and the vice president of Gemstar and Canstar, and the individual shareholders, who owned at least 60% of Gemstar's and Canstar's outstanding shares, held what the corporations' articles of association term "extraordinary meetings" for Gemstar and Canstar. At the meetings, Kunst and the individual shareholders formally ratified the filing of this suit.

After a lengthy trial, the judge instructed the jury on four claims: breach of contract, professional negligence, breach of fiduciary duty, and substantial assistance of Wauro's breach of fiduciary duty.[1] The judge instructed the jury to return separate verdicts relating to the individual shareholders and Gemstar and Canstar because of remaining jury issues concerning when the applicable statute of limitations periods began to run.

---

1. The substantial assistance claim is based on *Restatement (Second) of Torts* § 876(b), at 315 (1979), which imposes tort liability on a party who substantially encourages or assists another party to breach a duty owed to a third party and who knows that the other party's conduct is tortious.

After two days of deliberations, the jury returned verdicts on each of the four claims in favor of both the individual shareholders and Gemstar and Canstar. The jury awarded damages of $1.5 million to both the individual shareholders and Gemstar and Canstar for the breach of contract, breach of fiduciary duty, and substantial assistance claims and $2.4 million to both the individual shareholders and Gemstar and Canstar for the accounting negligence claim. The trial court then entered a single judgment for $2.4 million in damages for all plaintiffs and added prejudgment interest, attorneys' fees, and costs for a total judgment of $4,258,768.47.

## Discussion

### I. Plaintiffs' Capacity to Sue

We find that Gemstar and Canstar had capacity to sue directly because the corporations authorized the suit when it was filed in 1989. Because the jury returned separate verdicts in favor of both the individual shareholders and Gemstar and Canstar and because the damages awarded were duplicative, we need not address the individual shareholders' capacity to sue.

### A. Standard of Review

■ The issue of Gemstar and Canstar's capacity to sue is a question of law, which this court reviews *de novo*. *See, e.g., Tovrea Land & Cattle Co. v. Linsenmeyer,* 100 Ariz. 107, 114, 412 P.2d 47, 52 (1966).

### B. Procedural Background of Corporate Capacity Arguments

Defendants challenged Gemstar and Canstar's capacity to sue at several points in the trial court proceedings, on appeal, and again before this court. Defendants essentially argue that under *Restatement (Second) of Agency* § 90, at 230 (1958),[2] and Arizona case law, plaintiffs' attempt to ratify this suit in 1991 was ineffective because it occurred after the applicable statute of limitations periods had run. Plaintiffs respond that whether the 1991 ratification was timely is irrelevant because the suit was authorized when Gemstar and Canstar filed it in 1989.

The trial court rejected defendants' arguments concerning Gemstar and Canstar's capacity to sue without explanation, focusing instead on the individual shareholders' capacity to sue. The court of appeals, however, directly addressed Gemstar and Canstar's capacity to sue, adopting defendants' argument that the corporations could not maintain this suit because it was not ratified until after the applicable statute of limitations periods had run. *Gemstar Ltd.,* 183 Ariz. at 160, 901 P.2d at 1190, citing *Restatement (Second) of Agency* § 90. In connection with this holding, the court of appeals found that the applicable statute of limitations periods ran sometime before plaintiffs ratified the suit in July 1991. 183 Ariz. at 160 n. 9, 901 P.2d at 1190 n. 9 (stating that the parties did not raise on appeal the issue of when the statute of limitations ran and finding that plaintiffs waived "any argument that ratification occurred within the statute of limitations periods"). The court rejected plaintiffs' argument that the ratification was unnecessary, finding that plaintiffs had not shown any action by the corporations authorizing a direct suit when the suit was filed. 183 Ariz. at 161, 901 P.2d at 1191.

### C. Choice of Law

Before reaching the merits of the capacity to sue argument, we first address what law applies. Plaintiffs argue, in their petition for review, that the court of appeals should have applied B.V.I. law, rather than Arizona law, when it determined whether Gemstar and Canstar had capacity to sue. Although we also apply Arizona law when the B.V.I. law in the record is insufficient, we discuss the issue to set forth the proper choice of law analysis.

At trial, both plaintiffs and defendants initially asserted that B.V.I. law, as the law of the place of incorporation, governed whether Gemstar and Canstar had capacity to sue. To support their positions based on B.V.I.

---

**2.** *Restatement (Second) of Agency* § 90 provides that:

> If an act to be effective in creating a right against another or to deprive him of a right must be performed before a specific time, an affirmance is not effective against the other unless made before such time.

law, plaintiffs and defendants submitted the affidavits of two B.V.I. law experts pursuant to rule 44.1, Arizona Rules of Civil Procedure. Rule 44.1 allows the court, when determining foreign law, to consider "any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Arizona Rules of Evidence." These affidavits were the trial court's and the court of appeals' only sources of B.V.I. law.

The portions of the affidavits relating to Gemstar and Canstar's capacity to sue are summarized as follows. Plaintiffs submitted the affidavit of Jay Bartz, an Arizona attorney who practices international tax planning law. The Bartz affidavit provided that:

> [U]nder B.V.I. law a company whose name is struck off the Register of Companies is not thereby "dissolved"; rather, the company continues to exist and has the power to resume its business as a going B.V.I. concern as if it had never been struck off by having its name restored to the B.V.I. Register of Companies through the payment of annual license fees, annual return fees, penalties and reinstatement fees. In summary, as a result of the restoration of the names of Gemstar and Canstar to the Register of Companies, they are deemed to have continued in existence and may institute and maintain this lawsuit as if they had never been struck off.

Defendants submitted the affidavit of Sydney Bennett, a B.V.I. barrister and solicitor. The Bennett affidavit, like the Bartz affidavit, provided that restoring Gemstar and Canstar to the B.V.I. register of companies validated "whatever acts the company may have carried out in the period that it was struck off" and further added that "litigation commenced in that period would be retroactively made valid." The Bennett affidavit also addressed the issue of who may authorize suit on behalf of the corporation:

> The name of the company may only be used as plaintiff by the direction of the company or its directors and [the] company's name will be struck out as plaintiff in any action instituted in its name without such authorisation. This principle is illus-

trated by the case of *La Compagnie De Mayville v. Whitley*, 1 Ch. 788 (Eng.1896). The Bennett affidavit explains that the *Whitley* court held that a director could not file suit on behalf of a corporation because he did not get authority from the other directors or from the shareholders convened for that purpose. 1 Ch. 788, 803.

Although the trial court did not address directly the choice of law issue, the court of appeals addressed the issue as follows:

> [T]he parties appear to agree, although we are not bound to that agreement, that the substantive law of the British Virgin Islands, as the place of incorporation, governs issues regarding the corporations' legal existence and capacity to sue.... In this case, to the extent our resolution rests on an understanding of B.V.I. law, we have examined the parties' expert affidavits submitted to the trial court under authority of Rule 44.1, Arizona Rules of Civil Procedure.

*Gemstar Ltd.*, 183 Ariz. at 154, 901 P.2d at 1184 (citation omitted). The court then summarized the B.V.I. law experts' affidavits and concluded that:

> Based on our understanding of B.V.I. law from these sources, we conclude that we are not required to find, as a preliminary matter, whether B.V.I. law or Arizona law applies to this capacity determination, because we find no significant difference between those laws in the context of this case.

183 Ariz. at 155, 901 P.2d at 1185.

We revisit the choice of law issue now because, after examining the B.V.I. law in the record, we cannot conclude, as the court of appeals did, that we need not determine which law applies because Arizona and B.V.I. law are the same. When analyzing conflict of laws problems, Arizona courts look to the *Restatement (Second) of Conflict of Laws* for guidance. *See, e.g., Lucero v. Valdez*, 180 Ariz. 313, 315, 884 P.2d 199, 201 (App.1994). Section 302(2), *Restatement (Second) of Conflict of Laws* (1971), sets forth the choice of law principles applicable to issues involving a corporation's powers and liabilities:

The local law of the state of incorporation will be applied to determine [issues involving the rights and liabilities of a corporation], except in the unusual case where, with respect to the particular issue, some other state has a more significant relationship to the occurrence and the parties, in which event the local law of the other state will be applied.

The comments to § 302 explain that the law of the place of incorporation governs issues involving a corporation's "internal affairs" and that courts have "almost invariably" applied the law of the place of incorporation to such issues despite the fact that the corporation has little or no contact with the place of incorporation. Section 302, cmts. a, at 306–07, and g, at 311; *see also* 9 *Fletcher Cyclopedia of the Law of Private Corporations* (*Fletcher*) § 4223.50, at 5 (Supp.1994) ("the internal matters of corporate governance are governed by the law of the state of incorporation"). A corporation's internal affairs include its capacity to sue or be sued, and thus the law of the place of incorporation governs that issue. *See Restatement (Second) of Conflict of Laws* § 302, at 306; 19 C.J.S. *Corporations* § 893, at 550 (1990); *United States v. Northeastern Pharm. & Chem. Co.*, 810 F.2d 726, 746 (8th Cir.1986) (holding that Delaware law controlled Delaware corporation's capacity to sue or be sued). Because this case involves the internal affairs of Gemstar and Canstar, B.V.I. law, as the law of the place of incorporation, should govern whether Gemstar and Canstar have capacity to sue.

However, the summary of B.V.I. law set forth in the Bartz and Bennett affidavits is not sufficient to resolve the corporate capacity issue, despite the parties' contentions to the contrary. Plaintiffs assert that the B.V.I. statute allowing restoration resolves the corporate capacity issue. That statute merely provides that, once a corporation is restored to the B.V.I. register of companies, it is treated as if it had never been struck from the register. It does not resolve whether Gemstar and Canstar's suit was indeed properly authorized when filed in 1989. ▮ Conversely, defendants assert that the holding in *Whitley* resolves the corporate

capacity issue. *Whitley* merely holds that one director may not initiate suit on a corporation's behalf without the authority of the corporation, the other directors, or the shareholders. *See* 1 Ch. 788, 803. *Whitley* does not address in more detail what is required to authorize suit on behalf of a corporation.

The comments to *Restatement (Second) of Conflict of Laws* § 136 guide courts when the foreign law in the record is insufficient:

> [W]here either no information, or else insufficient information, has been obtained about the foreign law, the forum will usually decide the case in accordance with its own local law except when to do so would not meet the needs of the case or would not be in the interests of justice.

Cmt. h, at 378 (1971); *see also In re Shippy*, 37 Wash.App. 164, 678 P.2d 848, 850 n. 2 (1984) ("The presumption that foreign law is the same as that of the forum is employed when there is insufficient *proof* of foreign law which is conceded to apply to some or all aspects of a controversy.") (emphasis in original). Because the B.V.I. law in the record is insufficient to resolve the corporate capacity issue, we decide the issues not answered by B.V.I. law by looking to Arizona law and to the law of other jurisdictions, if no Arizona law is on point.

**D. Gemstar and Canstar's Capacity to Sue**

As mentioned above, we first note that because plaintiffs ultimately restored Gemstar and Canstar to the B.V.I. register of companies, the fact that the corporations were once struck from the register is irrelevant under B.V.I. law. We now turn to the issue of whether Gemstar and Canstar's suit was authorized when it was filed in 1989.

▮ As a general rule, a corporation's board of directors need not formally vote to authorize the institution of a suit brought by the corporation. *See Rothman & Schneider, Inc. v. Beckerman*, 2 N.Y.2d 493, 161 N.Y.S.2d 118, 119–21, 141 N.E.2d 610, 612–13 (1957); *G.O.K. Enters. v. Moos*, 172 A. 745, 746 (N.J.App.1934); *see also* 19 Am.Jur.2d *Corporations* § 2170, at 87 (1986); 19 C.J.S. *Corporations* § 629, at 277 (1990). For ex-

ample, the president of a corporation, acting alone, may institute suit on behalf of the corporation. *See, e.g., Cicero Indus. Dev. Corp. v. Roberts,* 63 Misc.2d 565, 312 N.Y.S.2d 893, 898 (Sup.1970) ("Absent express prohibition, an appropriate officer may institute corporate action to protect the corporation's assets without Board approval and without the necessity of resorting to a derivative action with its drawbacks."); *American Ctr. for Educ., Inc. v. Cavnar,* 80 Cal.App.3d 476, 145 Cal.Rptr. 736, 750 (1978) ("It is well settled that a corporation may sue upon authorization of its board of directors or upon the initiative of its president or managing officer."); *see also* 2A *Fletcher* § 618, at 185. *But see* 2A *Fletcher* § 618, at 186 (noting that some courts have held that the president has no such authority). Moreover, a vice president may act in the place of an absent president and "with the same authority possessed by him or her." 2A *Fletcher* § 627, at 200; *see also Buerger Bros. Supply Co. v. El Rey Furniture Co.,* 43 Ariz. 472, 476, 32 P.2d 1029, 1031 (1934) ("[T]he vice president of a corporation is presumed to have all the authority of the president, when the latter is not acting...."); *Lees v. Akshun Mfg. Co.,* 205 F.2d 577, 581 (7th Cir.1953) (vice president has authority to act where president has resigned). Thus, a vice president, under certain circumstances, has authority to institute a suit brought by a corporation. *See Streeten v. Robinson,* 102 Cal. 542, 36 P. 946, 947 (1894); *see also* 18B Am.Jur.2d *Corporations* § 1570, at 443 (1985).

■ In this case, plaintiffs filed suit against defendants in 1989. At that time, the individual shareholders owned at least 60% of Gemstar's and Canstar's shares, and included Adam Kunst, who was the corporations' vice president and a director. Additionally, by the time plaintiffs filed this suit, they had

sued Wauro, the corporations' president, for breach of contract and breach of fiduciary duty related to the land sale transactions. Finally, neither defendants nor the court of appeals has identified any provision of the corporations' shareholders' agreements or articles of association or any provision of B.V.I. or Arizona law that requires formal, written authority to commence litigation, and our independent research has revealed none. We therefore find that Wauro was effectively absent for the purposes of this litigation and that Kunst properly authorized the suit on behalf of Gemstar and Canstar.

Instead of focusing on the authorization issue, both defendants and the court of appeals focused on whether the corporations' 1991 ratification of the suit was timely. Because we find that the suit was authorized when filed, the ratification issue is irrelevant, and we do not discuss plaintiffs' or defendants' arguments regarding this issue, including the arguments raised in plaintiffs' supplemental brief. We therefore vacate the court of appeals' opinion holding that the corporations lacked capacity to sue.[3]

## II. Other Issues Defendants Raised on Appeal

Defendants raised numerous issues on appeal in addition to the capacity issue. We address those issues now to prevent further litigation and delay in this matter.

### A. Availability of Defendants' Illegality Defense

Before the trial began, defendants argued that plaintiffs' scheme to treat the sale to Ziggy's Opportunities as valid for tax purposes but as invalid for purposes of recovering the resale profits was illegal and against public policy. Defendants further claimed

---

**3.** Although plaintiffs did not raise the issue of whether defendants had standing to challenge Gemstar and Canstar's capacity to sue, we note that many courts have held that only a stockholder, officer, or director of a plaintiff corporation has standing to challenge that corporation's capacity to sue. *See, e.g., Farmers Union Oil Co. v. Maixner,* 376 N.W.2d 43, 46 (N.D.1985) ("[I]f a corporation does not object to an officer's lack of authority, a third person may not object."); *Hillcrest Paper Co. v. Ohlstein,* 10 Misc.2d 286, 172

N.Y.S.2d 827, 828 (Sup.1958), *aff'd,* 6 A.D.2d 864, 175 N.Y.S.2d 1021 (App.1959) (strangers to the corporation are not permitted to question an officer's authority to institute suit); *Village of Brown Deer v. City of Milwaukee,* 16 Wis.2d 206, 114 N.W.2d 493, 497 (1962) ("[I]f a corporation does not raise the objection that an officer lacked authority to do an act on behalf of the corporation, such objection may not be raised by a third person."); *see also* 9 *Fletcher* § 4216, at 15.

that the scheme's illegality provided a complete defense to plaintiffs' contract and tort claims because plaintiffs premised these claims on the enforceability of the sharing agreement. The trial court, however, refused to dismiss plaintiffs' case or to instruct the jury on defendants' illegality defense.

On appeal, defendants argued that the trial court erred when it declined to dismiss plaintiffs' case or to instruct the jury on defendants' illegality defense. Plaintiffs responded that the alleged illegality of their claim that the oral sharing agreement was still in effect despite the written agreement to sell the properties to Ziggy's Opportunities is irrelevant because plaintiffs did not base their claims on the sharing agreement's enforceability. Specifically, plaintiffs argued that its claims were based on defendants' contractual and tort duties to warn Gemstar and Canstar about any fraud or defalcations that came to defendants' attention while preparing the corporations' financial statements.

 Generally, a trial court has a duty to instruct the jury on all legal theories supported by the evidence. *See, e.g., Timmons v. City of Tucson,* 171 Ariz. 350, 355, 830 P.2d 871, 876 (App.1991). When a party argues on appeal that the trial court should have given a requested instruction, we review the evidence in the light most favorable to the party who requested the instruction. *See, e.g., Timmons,* 171 Ariz. at 355, 830 P.2d at 876. Moreover, when reviewing a trial court's denial of a motion to dismiss, we give deference to the trial court's factual determinations. *See Hovey v. Superior Court,* 165 Ariz. 278, 281, 798 P.2d 416, 419 (App.1990).

 Even when we apply the higher of these two standards and view the evidence in the light most favorable to defendants, we find that the trial court did not err when it declined to instruct the jury on defendants' illegality defense or to dismiss plaintiffs' case on that ground because the defense was not available in this case. As a result, we need not address whether the transactions at issue were in fact part of an illegal scheme to avoid paying taxes—a question better left to the United States Internal Revenue Service and the tax courts.

We agree with plaintiffs that this case is analogous to *Thomas v. Lundgren,* 9 Ariz. App. 94, 449 P.2d 628 (1969). In *Thomas v. Lundgren,* the plaintiffs were architects who were not licensed to practice in Arizona. The plaintiffs agreed to provide drawings and specifications for the construction of a motel in Flagstaff to Arizona Innkeepers, Inc. When Arizona Innkeepers' financing fell through, the defendant agreed to purchase the already completed drawings and specifications from the plaintiffs for $4,000. The defendant, however, paid the plaintiffs only $1,500, and the plaintiffs sued the defendant for the $2,500 balance due. The trial court entered judgment against the defendant. 9 Ariz.App. at 95–96, 449 P.2d at 629–30.

On appeal, the defendant argued that the plaintiffs could not recover the balance due because the plaintiffs' contract with Arizona Innkeepers involved the illegal practice of architecture in Arizona. 9 Ariz.App. at 96, 449 P.2d at 630. The court of appeals rejected the defendant's argument, holding that the illegality defense was unavailable because the plaintiffs' agreement with the defendant was to deliver drawings already completed, not to perform architectural services. The court reasoned that:

> It may be that plaintiffs' original contract with Arizona Innkeepers was an agreement made illegal by the provisions of the ... licensing statutes, but such a determination will not be necessary in this appeal. The subject matter of this cause is the agreement between plaintiffs and defendant, and before defendant may assert illegality in his behalf it must be that *this* agreement was one requiring plaintiffs to engage in illegal conduct.

9 Ariz.App. at 96, 449 P.2d at 630 (emphasis in original).

This case is similar to *Thomas.* Here, plaintiffs' contract and tort claims against defendants are based on defendants' agreement to provide accounting services to plaintiffs and to warn plaintiffs of any fraud of which defendants were aware, rather than on the allegedly unenforceable sharing agreement. Defendants owed plaintiffs this duty to warn regardless of whether the profits

that Wauro diverted are subject to capital gains tax. If defendants seek to assert an illegality defense in this action, they must do so with respect to their agreement to provide accounting services, which they have not done.

## B. Jury Instruction that Defendants Owed Plaintiffs a Fiduciary Duty as a Matter of Law

After the jurors were chosen and sworn in, the trial judge gave the jurors preliminary instructions. The trial judge noted that these instructions were intended merely to acquaint the jurors with the law and that the jurors would receive written instructions at the end of the trial, which would control their deliberations. With respect to plaintiffs' claim that defendants breached fiduciary duties owed to plaintiffs, the court preliminarily instructed the jury that whether a fiduciary relationship exists is a question of fact:

> The relationship between an accountant and his client is confidential, and an accountant *may* have to act with the utmost loyalty, good faith and disclosure towards his client. This special relationship is sometimes referred to as a fiduciary relationship.

> The plaintiffs here claim that as fiduciaries defendants stood in a trust relationship with the plaintiffs, that this trust relationship was breached and that as a result plaintiffs were damaged.

> *The plaintiffs have the burden of proving from the evidence which you will hear and see that there was a fiduciary relationship,* that it was breached by the defendants and that the breach caused the plaintiffs' damage.

(Emphasis added.)

At the close of the evidence, plaintiffs moved for a directed verdict that defendants were fiduciaries. The trial court granted plaintiffs' motion, and its final instructions to the jury provided that defendants were fiduciaries as a matter of law:

> The relationship between an accountant and his client is confidential. And an accountant *must* act with utmost loyalty, good faith and disclosure for his client.

This special relationship is sometimes referred to as a fiduciary relationship.

> *As fiduciaries, defendants stood in a trust relationship with plaintiffs.*

> Defendants have the burden of proving full compliance with all of their fiduciary duties. If the defendants failed to prove this full compliance, then the fiduciary relationship has been breached.

(Emphasis added.)

Defendants argued on appeal that a new trial should be granted because this final jury instruction was both erroneous and prejudicial. Specifically, defendants asserted that the instruction was erroneous because Arizona case law, as well as case law from other jurisdictions, uniformly holds that whether a fiduciary relationship exists is a question of fact and that there was sufficient evidence that defendants were not fiduciaries to submit the issue to the jury. Defendants also asserted that the final jury instruction was prejudicial because they relied on the preliminary instructions when they presented their case to the jury.

■■■ This court has held that when a party challenges a trial court's jury instruction, reversal is justified only if the instruction was both erroneous and "prejudicial to the substantial rights of the appealing party." *Walters v. First Fed. Sav. & Loan Ass'n,* 131 Ariz. 321, 326, 641 P.2d 235, 240 (1982); *see also Melancon v. USAA Cas. Ins. Co.,* 174 Ariz. 344, 347, 849 P.2d 1374, 1377 (App.1992) ("A jury verdict cannot stand if the instructions given create substantial doubt as to whether or not the jury was properly guided in its deliberations."). Furthermore, we have held that "[t]he prejudicial nature of the error will not be presumed but must affirmatively appear from the record." *Walters,* 131 Ariz. at 326, 641 P.2d at 240.

■■■ We first address whether the trial court's instruction was erroneous. Defendants correctly assert that whether a confidential relationship exists is generally a question of fact. *See Rhoads v. Harvey Pubs., Inc.,* 145 Ariz. 142, 148, 700 P.2d 840, 846 (App.1984); *see also Herz & Lewis, Inc.*

*v. Union Bank,* 22 Ariz.App. 437, 439, 528 P.2d 188, 190 (1974). However, this rule applies only if there is sufficient evidence to submit the issue to the jury: "When the evidence is insufficient to support a verdict, the trial court has a duty to decide the issue." *Rhoads,* 145 Ariz. at 148, 700 P.2d at 846.

Thus, in this case, the trial court's instruction was proper if the trial court's grant of a directed verdict that defendants were fiduciaries was proper. A directed verdict is appropriate if "the facts produced in support of the claim or defense have so little probative value, given the quantum of evidence required, that reasonable people could not agree with the conclusion advanced by the proponent of the claim or defense." *Orme School v. Reeves,* 166 Ariz. 301, 309, 802 P.2d 1000, 1008 (1990). On appeal, we review the trial court's grant of a directed verdict *de novo,* viewing the evidence in the light most favorable to the party opposing the motion. *Shuck v. Texaco Refining & Mktg., Inc.,* 178 Ariz. 295, 297, 872 P.2d 1247, 1249 (App.1994).

Defendants argued on appeal that defendant Edward Villanueva's testimony and the testimony of defendants' experts, Robert Blakey and William Raby, provided sufficient evidence to survive plaintiffs' motion for directed verdict. This evidence, however, even when viewed in the light most favorable to defendants, is insufficient to withstand plaintiffs' motion for directed verdict. First, although Villanueva testified that he did not believe that he owed fiduciary duties to the individual shareholders or Gemstar and Canstar, he did not testify that he had any special knowledge regarding when and if certified public accountants owe fiduciary duties. Second, defense experts Blakey and Raby both expressly testified that they were not qualified to testify about when accountants owe fiduciary duties to their clients. Additionally, defendants do not dispute that plaintiffs introduced evidence that Villanueva was a fiduciary with respect to plaintiffs. For example, plaintiffs' expert, Walter Cheifetz, testified that Villanueva owed fiduciary duties to both the individual shareholders and Gemstar and Canstar.

Thus, we find that the trial court properly granted a directed verdict on this issue, and the jury instruction was not erroneous. Because the jury instruction was proper, we need not address defendants' arguments concerning prejudice.

### C. Limitation of Testimony by Defendants' Damages Expert

On appeal, defendants argued that the trial court improperly refused to allow defendants' damages expert, Stephen Clarke, to testify that plaintiffs were not damaged because the tax free profit that they received from the sale to Ziggy's Opportunities was greater than the profits they would have received if Wauro had honored the "share and share alike" agreement and the profits were subject to capital gains tax. Plaintiffs answered, among other things, that the trial court properly excluded the testimony because Clarke was not qualified to provide the foundation for this testimony.

This court has held that the trial judge has broad discretion when determining whether a witness is competent to testify as an expert, and we will not overturn a trial judge's ruling on this issue unless there is a clear abuse of discretion. *See, e.g., Englehart v. Jeep Corp.,* 122 Ariz. 256, 258, 594 P.2d 510, 512 (1979); *see also Adams v. Amore,* 182 Ariz. 253, 254, 895 P.2d 1016, 1017 (App.1994) ("Trial courts have broad discretion in admitting expert testimony...."); 1 Morris K. Udall, J.M. Livermore, P.G. Escher & G. McIlvain, *Arizona Practice: Law of Evidence* § 22, at 29–30 (3d ed. 1991). Moreover, we have recognized that the trial court determines in each case "whether the expertise of the witness is applicable to the subject about which he offers to testify." *Englehart,* 122 Ariz. at 258, 594 P.2d at 512.

In this case, although the record does not indicate the ground on which the trial judge ruled, we find that the trial judge properly could have excluded Clarke's testimony on the basis that Clarke was not qualified to testify about the capital gains tax issue. Defendants argued that "there is no suggestion in the record that [the trial judge]

barred [Clarke's] testimony because he thought Clarke was unqualified to testify on the issue." After reviewing the record, however, we find no suggestion to the contrary. Rather, when the trial judge ruled on plaintiffs' motion in limine to exclude the testimony, he merely stated that the motion was granted and did not explain the basis for his decision.

Regarding Clarke's qualifications, he testified in a pretrial deposition that his area of expertise was calculating damages, but that he was not a tax accountant or an expert with regard to taxation of foreign or domestic corporations or individuals. Additionally, Clarke was still permitted to testify about the amount of damages plaintiffs sustained, and he did testify, on grounds other than the issue of capital gains tax, that plaintiffs did not suffer damages as a result of defendants' conduct and actually benefitted from defendants' actions. Therefore, the trial court could have concluded within its discretion that Clarke was not qualified to testify about whether, or the extent to which, plaintiffs' transactions would be subject to capital gains tax.

### D. Plaintiffs' References to the *Wauro* Judgment

As discussed above, plaintiffs obtained a judgment against Wauro for breach of contract and breach of fiduciary duty before trial in this case began. Defendants filed a motion in limine requesting that the trial court preclude plaintiffs from referring to the *Wauro* judgment during trial. Alternatively, defendants argued that if the trial court allowed plaintiffs to refer to the *Wauro* case, the trial court should minimize any prejudicial effect by redacting explicit references to the case from the transcripts and exhibits, by instructing witnesses not to mention the case, and by instructing the jury that the *Wauro* judgment was not binding on defendants.

The trial court ruled that plaintiffs could refer to the *Wauro* judgment but could not disclose the amount of the judgment. The trial court reasoned that plaintiffs would have to refer to the *Wauro* case when presenting evidence obtained from that case, such as prior testimony or exhibits, but that

it would be inappropriate for plaintiffs to say that the *Wauro* judgment was evidence that plaintiffs should prevail. Additionally, the trial court allowed defendants to present evidence that the *Wauro* case was being appealed and gave the following limiting instruction to the jury:

> On [September] 18th, 1990, plaintiffs recovered a judgment in another case against Wauro and his family company Ziggy's Opportunities for breach of fiduciary duties and breach of contract arising out of Ziggy's wrongdoing while a director and officer of the Gemstar, Canstar companies.
>
> Although in this case you will hear about these other lawsuits brought by the plaintiffs, you are not bound by the results in those cases. The evidence which you do hear may be considered by you unless I direct you to disregard it or unless I advise you to consider it for some limited purpose.

On appeal, defendants argued that the trial court abused its discretion by allowing plaintiffs to refer to the *Wauro* judgment to cast doubt on Edward Villanueva's credibility and to prove elements of plaintiffs' claim that Villanueva substantially assisted Wauro to breach his fiduciary duties. Defendants further argued that allowing these references violated defendants' due process rights, because defendants did not litigate these issues in the *Wauro* proceeding, and violated rule 403, Arizona Rules of Evidence, because the prejudicial nature of the evidence substantially outweighed its probative value. We will not disturb a trial court's rulings on the exclusion or admission of evidence unless a clear abuse of discretion appears and prejudice results. *Selby v. Savard*, 134 Ariz. 222, 227, 655 P.2d 342, 347 (1982).

When determining whether evidence is admissible under rule 403, Arizona Rules of Evidence, the trial court is accorded substantial discretion. *See, e.g., Walter v. Simmons*, 169 Ariz. 229, 241, 818 P.2d 214, 226 (App.1991); Udall, *Evidence* § 82, at 166–67. We agree with the trial court that, because of the similarities of the claims and

evidence between the two cases, precluding mention of the *Wauro* case would have been impractical. Furthermore, it is unlikely that defendants were prejudiced in light of the trial court's limiting instruction, the trial court's order precluding plaintiffs from mentioning the amount of the *Wauro* judgment, and the fact that defendants were entitled to mention that the *Wauro* case was being appealed. We therefore find that the trial court acted within its discretion when it concluded that the references to the *Wauro* judgment were admissible under rule 403.

We also reject defendants' argument that plaintiffs' references to the *Wauro* judgment violated defendants' due process rights because plaintiffs allegedly used the *Wauro* judgment to prove elements of their case against defendants. Defendants cite *Di Orio v. City of Scottsdale*, 2 Ariz.App. 329, 408 P.2d 849 (1965), and *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979), to support their position. These cases discuss the doctrine of res judicata, and they are not applicable to this case because the trial court's limiting instruction explicitly stated that the jury was not bound by the result in the *Wauro* case.

### E. Reduction of Plaintiffs' Damages Award by the Settlement Amount from the *Goodson* Case

Before trial in this case began, plaintiffs sued Gemstar's and Canstar's attorneys for damages arising from the same transactions and settled that action for $1,250,000 (the *Goodson* case). Neither plaintiffs nor defendants referred to the *Goodson* settlement during the trial in this case. At the close of evidence, the trial judge gave the following instruction to the jury:

> The law does not allow double recovery. Any amount actually received by an injured party from any person or entity who may have also been responsible for causing the injuries here will be credited by me, and I will reduce any judgment awarded to the injured party in this lawsuit. . . .
>
> You should not concern yourselves with whether the plaintiffs in this lawsuit have received payment or not from any person or entity who is not a defendant in this

lawsuit. If such payment has been received, I will reduce any award you make prior to the entry of a final judgment.

The trial judge most likely intended this instruction to apply to the *Wauro* case, of which the jury was aware.

Ultimately, the jury awarded $1.5 million to both the shareholders and the corporations for each of the breach of fiduciary duty, substantial assistance, and breach of contract claims. With respect to the accounting negligence claim, the jury found that plaintiffs' full damages were $4 million and that the corporations were not at fault, the individual shareholders were 40% at fault, and defendants were 60% at fault.

After the jury returned its verdicts, the trial judge declined to reduce the jury's award by the amount of the *Goodson* settlement and instead entered a single damage award of $2.4 million. The trial court stated that its refusal to reduce the jury verdict would "not result in an award to Plaintiffs in excess of their total damages [$4 million], or cause an economic windfall to Plaintiffs."

On appeal, defendants argued that the trial court should have reduced plaintiffs' damages award by the amount of the *Goodson* settlement because the damages plaintiffs sought to recover in this action were identical to the damages plaintiffs sought to recover in the *Goodson* case. Additionally, defendants argued that plaintiffs received a double recovery because plaintiffs conceded at trial that their full damages were 60% of the $4 million in profits that Wauro diverted. Finally, defendants argued that, under this court's holding in *Shelby v. Action Scaffolding, Inc.*, 171 Ariz. 1, 827 P.2d 462 (1992), the trial court should have deducted the *Goodson* settlement from plaintiffs' damages award first, then reduced plaintiffs' damages according to plaintiffs' degree of fault.

■ This issue presents a question of law, which we review *de novo*. *See, e.g., Tovrea Land & Cattle Co. v. Linsenmeyer*, 100 Ariz. 107, 114, 412 P.2d 47, 51 (1966). We find that the trial court did not err when it declined to reduce plaintiffs' damages by the amount of the *Goodson* settlement. We first reject defendants' argument that the

trial court should have reduced plaintiffs' damages according to the formula set forth in *Shelby*, 171 Ariz. at 3, 827 P.2d at 464. *Shelby* involved a case brought before the effective date of A.R.S. § 12–2506, the statute that essentially abolished joint and several liability in Arizona. Indeed, this court stated in *Shelby* that if that case had been brought after the effective date of § 12–2506, a different analysis would apply. 171 Ariz. at 4, 827 P.2d at 465. Therefore, because plaintiffs filed this case after the effective date of § 12–2506, *Shelby* does not control.

We also reject defendants' argument that plaintiffs have received a double recovery. Despite the fact that plaintiffs asserted at closing argument that their damages were $2.4 million, the jury found that plaintiffs' full damages were $4 million. The amounts that plaintiffs are to recover from these defendants ($2.4 million) and the *Goodson* settlement ($1.25 million) when added do not exceed that amount. Therefore, plaintiffs have not received a double recovery.

In addition, reducing plaintiffs' award by the amount of the *Goodson* settlement would undermine the policy justifications underlying several only liability. Under several only liability, the defendant is liable only for the amount of the plaintiff's damages that is proportional to the defendant's percentage of fault. A.R.S. § 12–2506(A). Thus, offsetting a plaintiff's damages by the amount of a non-party's settlement is unnecessary because the defendant pays only his share of the damages. *See Neil v. Kavena*, 176 Ariz. 93, 95, 859 P.2d 203, 205 (App.1993); *Roland v. Bernstein*, 171 Ariz. 96, 97–98, 828 P.2d 1237, 1238–39 (App.1991). A contrary rule would (1) give the benefit of an advantageous settlement to the non-settling tortfeasor, rather than to the plaintiff who negotiated the settlement, *Roland*, 171 Ariz. at 98, 828 P.2d at 1239; (2) "discourage some defendants from settling in anticipation of acquiring the benefits of the settlements of their co-tortfeasors," *Neil*, 176 Ariz. at 96, 859 P.2d at 206; and (3) neglect to recognize the fact that "[s]ettlement dollars are not synonymous with damages but merely a contractual estimate of the settling tortfeasor's liability," *Neil*, 176 Ariz. at 96, 859 P.2d at 206.

Furthermore, under A.R.S. § 12–2506(B), a defendant may introduce evidence of the negligence or fault of a non-party for the trier of fact's consideration. Defendants argued on appeal that they did not introduce such evidence because the trial court had determined that whether to set-off the *Goodson* settlement was a question of law. We disagree. First, the record regarding whether the trial court determined that this issue presented a question of law is not clear. Moreover, defendants most likely chose not to introduce evidence relating to the *Goodson* case for the same reasons that they wanted to preclude references to the *Wauro* case. We therefore find that the trial judge properly declined to reduce plaintiffs' damages by the amount of the *Goodson* settlement.

### F. Calculation of Prejudgment Interest

On appeal, defendants argued that the trial judge improperly calculated plaintiffs' prejudgment interest for two reasons: (1) the trial judge calculated the interest from the date plaintiffs claimed that Wauro diverted the funds, rather than from the date that plaintiffs first demanded the money from defendants, and (2) the trial judge failed to take into account the *Goodson* settlement.

■■■■■■ Whether a party is entitled to interest is a matter of law, which this court reviews *de novo*. *See Employer's Mut. Cas. Co. v. McKeon*, 170 Ariz. 75, 77, 821 P.2d 766, 768 (App.1991). We have held that prejudgment interest on a liquidated claim is a matter of right. *Fleming v. Pima County*, 141 Ariz. 149, 155, 685 P.2d 1301, 1307 (1984). Moreover, a claim is liquidated if the plaintiffs provide a basis for precisely calculating the amounts claimed. *Employer's*, 170 Ariz. at 78, 821 P.2d at 769, citing Charles T. McCormick, *Law of Damages* § 54 (1935).

■■■■■■ As a general rule, the trial judge should calculate prejudgment interest from the date the claim becomes due. *Lindsey v. University of Arizona*, 157 Ariz. 48, 54, 754 P.2d 1152, 1158 (App.1987); *see also* 1 Dan B. Dobbs, *Law of Remedies* § 3.6(5), at 358 (2d ed. 1993) ("Prejudgment interest accrues when the underlying obligation accrues."). An exception to this rule occurs in cases

involving unconditional money debts. The following example illustrates such a case:

> Suppose the defendant borrows $100 from the plaintiff on April 1 and is obliged to repay the loan on demand but the loan contract does not provide for interest. After April 1 the lender does not have the $100, but she has no cause of action to recover it until she demands it and the borrower refuses to pay.

*Id.* In cases involving unconditional money debts, prejudgment interest accrues from the date the plaintiff makes a demand. *Fairway Builders, Inc. v. Malouf Towers Rental Co.*, 124 Ariz. 242, 265, 603 P.2d 513, 535 (App. 1979) (Prejudgment interest is measured from the date of demand "in cases where no definite time for payment is stated.").

■ In this case, we reject defendants' claim that the trial court should have calculated plaintiffs' prejudgment interest from the date when plaintiffs first made a demand on defendants. This case does not involve an unconditional money debt payable only on demand. Rather, the profits that Wauro diverted were due at the time Wauro diverted them under the shareholders' "share and share alike" agreement. Additionally, we reject defendants' argument that the trial court should have considered the *Goodson* settlement when calculating plaintiffs' prejudgment interest. Defendants cite no authority for this proposition, and we see no reason why defendants should, as the fortuitous result of the *Goodson* settlement, pay interest on an amount less than the amount for which the jury held them severally liable.

### Disposition

We find that Gemstar and Canstar have capacity to sue because this suit was properly authorized when filed in 1989. Additionally, we have reviewed the other issues defendants raised on appeal and have resolved them in plaintiffs' favor. We therefore vacate the court of appeals' opinion and affirm the trial court's judgment in favor of Gemstar and Canstar.[4]

4. We do not address the individuals' capacity to sue. *See supra* Part I.
* Justice Frederick J. Martone is recused. Honorable Michael J. Brown, Judge of the Pima County

Both plaintiffs and defendants request an award of attorneys' fees pursuant to A.R.S. § 12–341.01. We grant plaintiffs' request and deny defendants' request. Plaintiffs may establish the amount of the award by complying with rule 21(c), Arizona Rules of Civil Appellate Procedure.

FELDMAN, C.J., ZLAKET, V.C.J., MOELLER, J., and MICHAEL J. BROWN, Judge,* concur.