NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

KEVIN WETHERILT, et al., *Plaintiffs/Appellants*,

*v.*

PATRICK H. MOORE, et al., *Defendants/Appellees*.

No. 1 CA-CV 15-0143
FILED 4-6-2017

Appeal from the Superior Court in Maricopa County
No. CV2011-014464
The Honorable John Rea, Judge

**AFFIRMED**

COUNSEL

Curry, Pearson & Wooten, P.L.C., Phoenix
By Michael W. Pearson, Kyle B. Sherman
*Counsel for Plaintiffs/Appellants*

Warner Angle Hallam Jackson & Formanek, P.L.C., Phoenix
By J. Brent Welker, Jerome K. Elwell
*Co-Counsel for Defendants/Appellees*

Jerome A. Moore, St. Clair Shores, Michigan
By Jerome A. Moore
*Co-Counsel for Defendants/Appellees appearing Pro Hac Vice*

---

**MEMORANDUM DECISION**

Presiding Judge Lawrence F. Winthrop delivered the decision of the Court, in which Judge Patricia K. Norris and Judge Kenton D. Jones joined.

---

**W I N T H R O P**, Presiding Judge:

¶1      This lawsuit arises from a crash landing on January 28, 2011, during the flight of an experimental kit aircraft—a RANS S-6ES—from Sedona to Buckeye, Arizona. The plane was piloted by Kevin Wetherilt, who was the only person onboard the plane at the time of the crash, and owned by Patten Harvey (collectively, "Plaintiffs"). The aircraft's elevator control bracket assembly apparently became inoperative during flight, severely limiting Wetherilt's ability to maneuver and land the plane, and Plaintiffs sought to show that the defendant, Patrick H. Moore—a licensed airframe and power plant ("A&P") mechanic, who had conducted annual inspections of the aircraft, including most recently on November 15, 2010— was the only person to have inspected or otherwise handled the hardware of the elevator control system before the accident and had been negligent in doing so. Plaintiffs, however, were unable to present direct evidence that a defect in the elevator control system existed when Moore completed his annual inspection, and at the conclusion of the trial in this matter, the jury rendered a defense verdict. Plaintiffs appeal the jury's verdict and the trial court's denial of their motion for a new trial, arguing that evidentiary errors occurred during trial that require reversal. Finding no error necessitating a new trial, we affirm.

**FACTS AND PROCEDURAL HISTORY[1]**

¶2      After the accident, Plaintiffs filed a complaint alleging negligence, negligence per se, breach of contract, breach of implied

---

[1]    In general, we view the facts and inferences therefrom in the light most favorable to affirming the verdict. *See Paul Schoonover, Inc. v. Ram Constr., Inc.*, 129 Ariz. 204, 205, 630 P.2d 27, 28 (1981).

warranty of fitness, and breach of implied warranty of workmanship against Moore and others.[2]

¶3        Before trial, the parties filed several motions involving the aircraft's "airworthiness certificate" issued by the Federal Aviation Administration ("FAA"), and numerous motions for full or partial summary judgment that the trial court mostly denied.[3]  The court's pretrial minute entries include the following rulings and analyses:

> [T]he [National Transportation Safety Board ("NTSB")] report states that the <u>probable cause</u> of the accident is "[a] disconnection of the elevator control linkage due to incorrect installation or maintenance, which was due to the retaining nut backing off the belt and allowing the bolt to fall out."
>
> . . . . Based on the NTSB report, there is a question of fact as to the cause of the accident and if the cause was the disconnection and whether the disconnection occurred as a result of improper assembly or improper maintenance.
>
> . . . .
>
> There is a question of fact as to whether the control linkage was secure when inspected by Defendant Patrick Moore.  The facts of the accident and the evidence secured at the scene are evidence from which a jury could conclude that Defendant failed to properly conduct the annual inspection,

---

[2]        In addition to Moore (and his wife), the First Amended Complaint also named as defendants Edward Snyder and his wife, Patricia; the Snyders' business, Sport Planes Unlimited; and an employee of the Snyders, Robert Tolbert.  Plaintiffs alleged Snyder, Tolbert, and Sport Planes Unlimited negligently built or fully assembled the aircraft before its sale to Harvey in 2007.  Snyder acknowledged that he or his business built the major portion of the aircraft, but the Snyders sought bankruptcy protection, and were eventually dismissed without prejudice from the lawsuit.  This appeal involves only Moore.

[3]        The trial court granted Plaintiffs' motion for partial summary judgment as to the affirmative defenses of quasi-estoppel, assumption of the risk, and "airworthiness," but noted that "Plaintiff[s] must still prove that Defendant Patrick Moore was negligent and that his negligence was a cause of the accident."

but are not conclusive as to any of Plaintiff's claims. Defendant Patrick Moore contends that he inspected the aircraft and the cotter pins, nuts and bolts in the elevator and contends that the control stick mechanism was in place and secure. The case is rife with questions of fact.

. . . .

Defendants seek summary judgment on the theory that the subject aircraft was not "airworthy" because the airworthiness certificate Plaintiff obtained from [the] FAA was obtained under the false pretense that Mr. Harvey was the "builder[.]" Neither Plaintiffs nor Defendants, however, are claiming that the cause of this crash was the alleged falsified claim by Mr. Harvey in his "Eligibility Statement Amateur–Built Aircraft" form submitted to the FAA that he was the builder. Rather Defendants concede that the cause of the crash was the failure of the "bolts, nuts, washers and cotter pins that held the aircraft's elevator control bracket together" to stay assembled. *That Mr. Harvey may have submitted false information to the FAA about who built the aircraft to obtain eligibility for experimental amateur built aircraft status with the FAA for purposes of an airworthy determination may go to []his credibility, but not to the agreed upon cause of this accident.*

. . . .

Defendants Moore seek summary judgment arguing that there is no issue of material fact as to how the crash occurred, and that Plaintiffs have no physical evidence that Defendant Pat Moore caused the elevator control bracket assembly to come apart. However, Plaintiffs' burden of proof is not proof with absolute certainty or even beyond a reasonable doubt. Plaintiffs' burden of proof is by a preponderance of evidence. Although there is no direct evidence that Defendant Moore caused the bracket assembly to come apart, there is circumstantial evidence. Defendant Moore, according to Plaintiffs, was the last person to have inspected the aircraft. The crash occurred 24 flight hours after the inspection. That circumstantial evidence is sufficient to create a question of fact as to whether Defendant Moore was negligent in his inspection and whether his negligence caused the crash.

. . . .

*Defendants may bring out information about whether or not the airplane can be certified as to its airworthiness for the purposes of evaluating its market value.*

(Emphasis added.) As the trial court's pretrial rulings made clear, Moore could broach the subject of the aircraft's airworthiness certificate for the purposes of impeaching Harvey and evaluating market value/damages, but not as a causation defense.

**¶4**　　　At trial, Wetherilt testified he provided flying lessons to others, including Harvey. According to Wetherilt, his log indicated that, after the November 15, 2010 inspection, he used Harvey's plane for flight instruction on November 18, 19, and 30, and December 1, 7, 8, 9, 19, 20, and 21, 2010. During that time, he experienced no difficulty with the elevator control system. The next time he flew the plane was slightly more than one month later—on January 28, 2011.

**¶5**　　　Wetherilt had obtained permission from Harvey to use the airplane to fly to Buckeye and attend a January 29 "fly-in" at an airstrip south of Phoenix. On January 28, Wetherilt drove to Sedona—where Harvey's plane was kept—and inspected the plane, including its flight control systems, finding no problems. His inspection included manually moving the horizontal elevator panel, which felt normal.

**¶6**　　　After completing his pre-flight inspection, Wetherilt taxied to the runway, conducted a pre-flight engine test, and began his flight toward Buckeye. Approximately ten minutes into his flight, he reached 8,500 feet and pushed the elevator stick forward to level off, but nothing happened. He increased altitude and tried the co-pilot's stick, without success, then ripped off the console between the seats, exposing the elevator control rod. He pushed the stick again and the control rod moved, but nothing else did, indicating to him the elevator control system had come apart somewhere else.

**¶7**　　　Knowing his cell phone worked better near Cottonwood, he tried to turn in that direction, but that maneuver caused the plane to go into a downward spiral, which he could not control. After losing approximately 1,000 feet of altitude, the plane leveled off on its own. Wetherilt texted a friend who was an aircraft mechanic experienced with RANS aircraft, but the friend's suggestions provided no solution, and they concluded Wetherilt could not get to the area of the plane in need of repair while the plane was in flight.

¶8        Wetherilt decided to continue to Buckeye, which had a long runway and would not involve flying over a city or into a busy airport. During the flight, Wetherilt could control the plane somewhat in making it go up or down, but turns were next to impossible.

¶9        Approximately twelve miles outside his destination, Wetherilt radioed the Buckeye airport.[4]  He contacted a Lufthansa Airlines training plane occupied by three pilots, who informed him several planes were in the landing pattern.  Wetherilt explained he could not enter the landing pattern, but needed to fly straight in, and asked that other planes be kept away.  The pilot of the training plane agreed to assist him and follow him in.

¶10        As Wetherilt's plane approached the runway—with an altitude of approximately fifty feet—a sudden down-draft forced the plane's nose down.  Wetherilt tried applying more power, but without effect, and the plane hit the ground nose down while traveling approximately one hundred miles per hour.  The nose landing gear was ripped off, and the plane skidded to a stop a few feet to the left of the runway.  As the plane came to rest, Wetherilt became aware of sparks, smoke, and the smell of gasoline.  He quickly crawled out of the plane, and the three Lufthansa pilots helped him shut off electrical circuits and a gasoline valve.

¶11        Wetherilt called Terry Brandt, a "flying guru" in the Buckeye area, who advised Wetherilt to call the Scottsdale FSDO, the FAA agency to be contacted in the event of an aircraft accident.  Wetherilt made that call, and FAA safety inspector Jeff Miller arrived at the Buckeye airport approximately two hours later.  Meanwhile, Brandt arrived approximately thirty minutes after Wetherilt's call.  According to Wetherilt, other than turning off the electrical circuits and the gasoline valve, neither he nor anyone else touched or moved the plane until Miller's arrival.  The three Lufthansa pilots and Brandt stayed with Wetherilt while awaiting Miller.

¶12        When Miller arrived, he spoke with Wetherilt, who informed Miller that he had not been physically injured.  Over the next two hours, Miller—followed by Wetherilt—inspected the aircraft, taking pictures and opening the fuselage, which exposed where the rod in the elevator control

---

[4]        The Buckeye airport, like the Sedona airport, is an uncontrolled airport, meaning that it does not have a control tower.

system was disconnected.[5]  The following day, Wetherilt called Harvey, who was vacationing in Hawaii, to inform him of what had happened.[6]

¶13        Miller, the FAA investigator, testified by deposition regarding his investigation.  After arriving at the crash site, he interviewed Wetherilt, who stated he was not physically injured.  Miller prepared field notes, which disclosed the bolt connecting the aft elevator push-pull control tube to the control stick was missing and not to be found, and the bolt connecting the forward push-pull tube to the control stick was ready to fall out.  These were AN drilled shank bolts,[7] requiring a washer, castellated nut, and cotter pin for safety; however, the hardware was all missing, and Miller found neither the missing hardware nor any opening in the bottom of the aircraft that would permit hardware from the elevator control system to fall out of the plane's fuselage.

¶14        Miller's testimony differed from that of Wetherilt on numerous points:  For example, Wetherilt testified the Lufthansa pilots remained at the scene; however, Miller testified Wetherilt was the only witness to the accident present when he arrived.  Wetherilt and Miller also disagreed as to who cut the aircraft's fuselage fabric and opened the

---

[5]        Wetherilt made a report for the FAA approximately one week after the crash.  His report described the elevator control bracket assembly having come apart.  Two of the three nuts had come off, one bolt was completely out, and another had almost come out.  None of the bolts had cotter pins inserted in them.  He had no knowledge about who caused the elevator control system's condition.

[6]        At trial, Harvey testified that after acquiring his plane, he hired Moore to do annual inspections in 2008, 2009, and 2010.  Harvey claimed he "never saw a checklist," but relied on Moore's expertise as a mechanic to perform these inspections competently and certify his plane as fit for flight.  Harvey also testified he had spent slightly more than $70,000 to purchase the aircraft, and presumably wished to recover approximately that amount, but conceded that the current value of the plane "as is" was approximately $45,000.

[7]        AN, or "Army-Navy," is a designation meaning the bolt is designed and manufactured according to military specifications, and is the industry standard for aircraft bolts.  AN bolts are generally far superior to common hardware bolts.

underside of the plane to initially disclose the elevator control failing; whether Brandt had found the missing bolt on the runway; and whether Miller had even spoken with Brandt during his investigation.[8]

**¶15** Miller did not further speak with Wetherilt after the day of the accident, but interviewed Harvey and Moore. Harvey stated Moore was the only person who had worked on the aircraft, but acknowledged he also had a repairman's certificate.[9] Miller reviewed Moore's aircraft maintenance log books, including the engine and propeller log books, and noted there was no indication Moore had disassembled the elevator control bracket assembly. Miller could not recall in his deposition whether the elevator control bracket assembly had received maintenance, although he asserted most A&P mechanics "would look at" that. Although Moore received a warning letter advising him to more fully describe his work in his log books, Miller did not find anything indicating Moore was at fault.

**¶16** As part of his defense, Moore sought to show Wetherilt, Harvey, and other persons had access to the aircraft after he conducted the annual inspection on November 15, 2010, and could have performed maintenance on the aircraft and/or otherwise meddled with it by disassembling the elevator control bracket system. Moore also testified regarding his extensive experience as an A&P mechanic and licensed pilot,

---

[8] In a supplemental disclosure statement, Wetherilt stated a bolt was found by Brandt on the ground at the Buckeye airport the day of the crash and shown to Wetherilt and Miller. Miller, however, testified he looked for the missing hardware that day, but did not find it, and stated if someone had presented hardware found on the runway believed to be from the plane, he would have photographed the items and referenced them in his report.

[9] *See* 14 C.F.R. § 65.104. Under subsection (a)(2) of 14 C.F.R. § 65.104, "[t]o be eligible for a repairman certificate (experimental aircraft builder), an individual must . . . [b]e the primary builder of the aircraft to which the privileges of the certificate are applicable." At his April 16, 2013 deposition in this case, Harvey testified he had not participated in assembling or fabricating the aircraft, and had "not done anything on the airplane but change the oil and help a guy change the spark plugs." Harvey surrendered his repairman's and airworthiness certificates to the FAA shortly before his deposition.

noting that, for periods exceeding fifty years as a mechanic and pilot, he had never had a violation.

¶17 Moore had performed annual inspections of Harvey's aircraft in 2008, 2009, and 2010, using a check sheet covering all areas to be examined. In the 2008 inspection, the nuts, bolts, and cotter pins were found to be properly secured on the elevator control bracket. Moore further testified his November 15, 2010 inspection was carefully and properly done[10]; the plane was safe for flight when he signed Harvey's logbook; his certification stopped at the point of signing the logbook and did not cover changes after that time; if the cotter pins were not in place, and the nuts worked their way off the bolts, causing one of the bolts to fall off the elevator control assembly, the hardware should have been found on the floor of the aircraft; pictures of the disconnected elevator control system after the crash were inconsistent with the condition of that system as observed by him on November 15, 2010; and the only explanation for the disconnected system was that someone disassembled it after his annual inspection. Moore did not touch Harvey's plane between November 15, 2010, and January 28, 2011, with the exception of minor servicing events on November 19, 2010 (when he reconnected the cylinder head temperature device) and January 6, 2011 (when he replaced the tires).

¶18 After four days of trial, the jury returned a unanimous defense verdict. The trial court entered a judgment in favor of Moore, ordering Plaintiffs to pay costs and Harvey to pay attorneys' fees. In a minute entry filed January 9, 2015, the trial court summarily denied Plaintiffs' motion for a new trial.

¶19 We have jurisdiction over Plaintiffs' appeal. *See* Ariz. Rev. Stat. ("A.R.S.") § 12-2101(A)(1), (5)(a) (2016).

**ANALYSIS**

*I.     Standard of Review*

¶20 We will affirm the trial court's rulings on the admission of evidence absent an abuse of discretion or legal error and resultant prejudice. *See Gemstar Ltd. v. Ernst & Young*, 185 Ariz. 493, 506, 917 P.2d 222, 235 (1996); *Brown v. U.S. Fid. & Guar. Co.*, 194 Ariz. 85, 88, ¶ 7, 977 P.2d

---

[10] Moore testified he told Miller he did not recall the direction of the cotter pins in the 2010 inspection; however, Miller's field notes indicated Moore said he remembered seeing the nuts on the bolts, but could not remember seeing the cotter pins.

807, 810 (App. 1998) (citing *Gasiorowski v. Hose*, 182 Ariz. 376, 382, 897 P.2d 678, 684 (App. 1994)).  Thus, we will not reverse if the jury would have reached the same verdict without the admitted evidence.  *See Brown*, 194 Ariz. at 88, ¶ 7, 977 P.2d at 810.  We review legal questions and the interpretation of statutes *de novo*.  *See, e.g.*, *Open Primary Elections Now v. Bayless*, 193 Ariz. 43, 46, ¶ 9, 969 P.2d 649, 652 (1998).

### II.    *Defense Counsel's Alleged Misconduct and Airworthiness*

**¶21**        As we have noted, before trial, the parties disputed whether the circumstances surrounding the FAA's issuance of the special airworthiness certificate for Harvey's aircraft could be used as a defense to Plaintiffs' claims.[11]  The trial court ruled the subject of the airworthiness certificate could not be used for causation purposes, but could be used for impeachment and damages purposes.  As we discuss later, the record fully supports the court's pretrial rulings, and we find no abuse of discretion regarding those rulings.  *See Gemstar*, 185 Ariz. at 506, 917 P.2d at 235.

---

[11]    An airworthiness certificate for a plane such as Harvey's requires compliance with the provisions of 14 C.F.R. § 21.191, which addresses experimental certificates and provides in part as follows:

> Experimental certificates are issued for the following purposes:
>
> (a) Research and development.  Testing new aircraft design concepts, new aircraft equipment, new aircraft installations, new aircraft operating techniques, or new uses for aircraft.
>
>        . . . .
>
> (g) Operating amateur-built aircraft.  Operating an aircraft *the major portion of which has been fabricated and assembled by persons who undertook the construction project solely for their own education or recreation*.

(Emphasis added.)  Harvey's certificate of eligibility, signed and submitted by him to the FAA, stated he had complied with the requirement of subsection (g) by fabricating and assembling the major portion of his aircraft.  As Harvey conceded, however, although he had fully paid for the building of the plane, Snyder/Sport Planes Unlimited fabricated and assembled the plane before its delivery to Harvey.

¶22          Plaintiffs argue Moore's defense counsel committed misconduct throughout his opening statement, questioning of witnesses, and closing argument.  A verdict or judgment may be vacated and a new trial granted if misconduct of the prevailing party materially affected the rights of the aggrieved party.  Ariz. R. Civ. P. 59(a)(2).  "Misconduct materially affects an aggrieved party's rights where it appears probable the misconduct actually influenced the verdict."  *Maxwell v. Aetna Life Ins. Co.*, 143 Ariz. 205, 215, 693 P.2d 348, 358 (App. 1984).  "The introduction of evidence or pursuit of a line of argument which has no bearing on the alleged wrong but which serves only to prejudice the jury is grounds for reversal."  *Elledge v. Brand*, 102 Ariz. 338, 339, 429 P.2d 450, 451 (1967) (citations omitted).  Statements made to a jury not supported by facts or reasonable inference that result in prejudice may also constitute reversible misconduct.  *See, e.g.*, *Grant v. Ariz. Pub. Serv. Co.*, 133 Ariz. 434, 450-51, 652 P.2d 507, 523-24 (1982); *Sisk v. Ball*, 91 Ariz. 239, 245, 371 P.2d 594, 598 (1962).

### A.          Alleged Misconduct in Opening Statement

¶23          Even assuming Plaintiffs fully preserved each of their arguments through timely objections, we find no error requiring reversal.  Plaintiffs generally assert without elaboration that various comments made by defense counsel in his opening statement were "inadmissible."  As a plain assertion, we agree.  The trial court addressed this issue in its preliminary instructions when it cautioned the jury that the lawyers' statements and arguments were not evidence:  "It is important that you distinguish in determining what the facts are between the testimony that you hear under oath and what the lawyers say.  Only the testimony is evidence.  What the lawyers say is not evidence."  The court reiterated this instruction during trial.  We presume the jury followed the court's instructions.  *See State v. LeBlanc*, 186 Ariz. 437, 439, 924 P.2d 441, 443 (1996).

¶24          Plaintiffs also assert defense counsel attempted to use the subject of airworthiness for causation purposes in his opening statement.  The portion of the record they cite reveals the following:  At trial, defense counsel began his opening statement by broaching the subject of airworthiness and Harvey's credibility.  Plaintiffs' counsel objected and, outside the presence of the jury, argued that although the court had ruled Moore could bring the subject of airworthiness in for damages or impeachment purposes, the subject of airworthiness could not be used for causation purposes.  The trial court noted the objection, but denied it,

concluding that, although defense counsel had come "pretty close," counsel had not yet "crossed the line."  We find no error in the court's ruling.[12]

¶25            In his opening statement, defense counsel also stated that "[f]or reasons we may get into in this trial, this particular aircraft *no longer* has an airworthiness certificate."  (Emphasis added.)  The court overruled Plaintiffs' unspecified objection to this statement, and Plaintiffs argue that misconduct occurred because defense counsel knew the aircraft had a valid airworthiness certificate *at the time of the accident*.  Contrary to Plaintiffs' suggestion, defense counsel's statement was not improper or a misstatement of the facts.  We find no error.

¶26            Plaintiffs also argue defense counsel improperly suggested Moore would only be liable to Plaintiffs if Moore took apart the elevator control bracket.  The court instructed the jury, however, that Moore could be liable for negligence if he failed to "use reasonable care," which "may consist of action or inaction."  We presume the jury followed the court's instructions.  *See LeBlanc*, 186 Ariz. at 439, 924 P.2d at 443.  Although Plaintiffs suggest other statements of defense counsel may have constituted misconduct, their contentions are not fully developed, with supporting reasons and citation to the record, *see* ARCAP 13(a)(7)(A)-(B), and in our review of the record, we have found no misconduct requiring reversal related to the remainder of defense counsel's opening statement.

---

[12]            Plaintiffs further argue the trial court should have presented the jury with "a limiting or curative instruction on the relationship between the Airworthiness Certificate and the other elements of Plaintiffs' claims."  Although Plaintiffs did file an "Objection to Defendants' Supplemental Proposed Jury Instructions and Motion for Curative Instructions" after defense counsel's opening statement, they do not in their opening brief cite to a portion of the record where they proposed a specific instruction.  Moreover, when presented with the court's proposed final instructions and specifically asked whether there was "anything you want to put on the record about the instructions that were given or not given or modified," Plaintiffs' counsel stated that, other than an instruction regarding insurance (which we later address), he was "fine with it."  Accordingly, to the extent Plaintiffs challenge the trial court's final instructions, including the lack of a limiting or curative instruction, they have waived that argument.

###### B.     Other Alleged Misconduct

**¶27**        Plaintiffs' primary argument supporting a finding of misconduct is that defense counsel unfairly sought to impeach Harvey's credibility by improperly and repetitiously calling the jury's attention to circumstances surrounding the FAA's issuance of the airworthiness certificate for Harvey's aircraft, as well as Harvey's voluntary relinquishment of the airworthiness certificate to the FAA more than two years after the accident.[13]  Plaintiffs maintain defense counsel committed misconduct in questioning several witnesses about the airworthiness certificate, including asking Harvey about his lack of involvement in building the aircraft and prior "misrepresentation" to the FAA that he was the aircraft's "builder"[14]; questioning Plaintiffs' expert witness, Charles Hicks, about the requirements for an airworthiness certificate and Harvey's alleged misrepresentation to the FAA; questioning Gary Towner, a retired FAA safety inspector and designated airworthiness representative who had previously certified Harvey's aircraft for airworthiness[15]; and questioning James Woods, a retired FAA inspector and investigator, who acted as an expert witness pertaining to experimental aircraft for Moore.

**¶28**        In this case, even though his aircraft had a valid airworthiness certificate issued by the FAA before the crash—and had therefore in his

---

[13]     Throughout the trial, Plaintiffs' counsel made no objection on the basis that any evidence was cumulative and only once objected on the basis that a question had been "asked and answered," during defense counsel's cross-examination of Harvey.  The court overruled that single objection.

[14]     Plaintiffs argue that Harvey's statements contained "no inconsistencies" and "there was nothing for the Defense to impeach" because "Harvey consistently testified that he did indeed sign as the 'builder' on relevant forms and that he did not assist in the building of the aircraft."

[15]     Towner, who accepted Harvey's certificate of eligibility at "face value" and issued the airworthiness certificate, testified the requirement in 14 C.F.R. § 21.191(g) that an amateur builder of an experimental aircraft participate in more than fifty percent of the plane's fabrication and assembly had remained unchanged from at least 2003 through the time Harvey sought the airworthiness certification.  Towner stated that, had he known Harvey had no participation in building the aircraft, he would not have certified it.

words been "exonerated" by the FAA—Harvey's veracity in obtaining the certificate by representing he was the "builder" who had fabricated and assembled the aircraft—and thus his credibility—could be fairly explored and attacked because he provided verification inconsistent with his subsequent representations and testimony. *See* Ariz. R. Evid. 607. Further, the documents referred to by defense counsel on cross-examination of Harvey had been admitted upon stipulation of counsel at the onset of trial, and could be fairly "inquired into" as "probative of [Harvey's] character for truthfulness or untruthfulness." Ariz. R. Evid. 608(b)(1). Additionally, the witnesses questioned by defense counsel testified that an aircraft cannot be operated without a valid airworthiness certificate, and whether Harvey could qualify as the "builder" was legally significant to the issue of whether his aircraft could be repaired, recertified with a valid airworthiness certificate, and then sold. Defense counsel properly solicited information about whether the aircraft could be recertified as to its airworthiness for the purpose of evaluating its market value and Harvey's claim for damages.[16]

¶29             Moreover, we reject Plaintiffs' reliance on one juror's question to Harvey concerning his understanding of the meaning of the term "builder" as evidence that defense counsel's questioning unfairly influenced the jury's verdict. Defense counsel objected to the question, arguing that 14 C.F.R. § 21.191(g) "says that a builder means major portion must fabricate or assemble a major portion of the aircraft." The following colloquy occurred:

> THE COURT: Well, the – you've raised this issue to his credibility, and this goes directly to whether it should effect [sic] his credibility or not.
>
> [PLAINTIFFS' COUNSEL]: I agree, Your Honor.
>
> THE COURT: Doesn't go to whether it's airworthy or not. It goes to his credibility.
>
> [PLAINTIFFS' COUNSEL]: That's exactly right.

Shortly thereafter, the court addressed Harvey as follows: "The next question deals with the line of questioning about whether you built the plane or not and what you signed. Did you misinterpret what, quote,

---

[16]     As the trial court noted in its October 15, 2014 minute entry awarding Moore attorneys' fees, costs, and Rule 68(g) sanctions, "The issue of airworthiness was relevant to the value of the aircraft and therefore central to the amount of Harvey's damages."

builder of plane, close quote, means; that is, whether it was physical building versus financing and ordering the plane to be built?" Harvey answered, "It never occurred to me in the whole circumstances whether this airplane was illegal or not. I was not going to put $70,000 in an illegal airplane."

¶30 Plaintiffs' counsel's affirmation that the juror's question went to Harvey's credibility, and Harvey's answer—which addressed his credibility and the plane's market value—provide no indication that defense counsel's prior questioning unfairly influenced the jury's verdict by arousing passion or prejudice on the part of the jury.

### III. *Airworthiness*

¶31 Plaintiffs argue that, even if defense counsel's conduct did not rise to the level of reversible misconduct, the trial court's pretrial rulings allowing testimony on the subject of the airworthiness certificate for damages and impeachment purposes nonetheless constituted error because they had the effect of allowing a debate on airworthiness despite the fact that the FAA has exclusive authority to determine whether an aircraft is fit for flight and has certified the aircraft airworthy.

¶32 The trial court did not err in allowing Moore to present evidence of circumstances that might diminish the value of Harvey's claim. Harvey himself acknowledged an experimental aircraft cannot be flown without an airworthiness certificate, and Plaintiffs' witness, Charles Hicks, affirmed that if an experimental aircraft is sold without such a certificate, its value would be diminished.

¶33 Moore's witness, Towner, the designated airworthiness representative, testified that for a plane such as Harvey's to receive an airworthiness certificate, there must be both a certification by a qualified person that the plane has been inspected for safe operation and an affidavit from the amateur builder that he or she fabricated and assembled at least fifty-one percent of the experimental aircraft. Because experimental aircraft are not subject to all the maintenance regulations that apply to other aircraft, the designated airworthiness representative prepares a list of operating limitations that apply to the plane being certified, and annual inspections are required. The annual inspections are to be done by a certified airframe mechanic or a person possessing a repairman's certificate. The only person eligible to receive a repairman's certificate would be the plane's builder.

¶34        Moore's other witness, Woods, explained why major participation by the builder in the fabrication and assembly of a self-built experimental plane is required when he testified that a repairman's certificate is "a certificate that allows the builder of the amateur-built aircraft to perform maintenance on his own aircraft. The presumption being he built it, who better to know how to work on it." Woods also testified that the requirement of requiring a "major portion builder" for certification had not changed, and the FAA was required to follow the applicable regulations. Additionally, if an airworthiness certificate is surrendered, it can be recertified by the owner; however, if the owner had not actually done the major portion of the original fabrication and assembly, the owner would have to disassemble the aircraft, reconstruct it, and submit an eligibility statement affirming the owner had done not less than fifty-one percent of the fabrication and assembly. Further, if the aircraft were sold in its un-airworthy condition, its market value would presumably be impacted because the buyer would have to go through the same process of disassembling the plane, reconstructing it, and applying for an airworthiness certificate by affirming he had built at least fifty-one percent of the aircraft, or seek to go through a different classification, designated as "experimental airshow, experimental exhibition."

¶35        The preceding testimony on airworthiness was at least marginally relevant in that it directly impacted considerations of the plane's market value and Harvey's damages claim. We find no abuse of discretion regarding the trial court's decision to allow testimony regarding the subject of airworthiness as related to Harvey's damages. *See Gemstar*, 185 Ariz. at 506, 917 P.2d at 235.

        *IV.     The Scope of James Woods' Testimony*

¶36        Plaintiffs assert that Woods testified regarding a multitude of topics outside the scope of Moore's Rule 26.1 disclosure statement—and presumably Woods' scope of expertise—including the possible causes of the accident, the steps to recertify Harvey's aircraft, and the impact of certification on the value of the aircraft.

¶37        A summary of Woods' testimony reveals the following: Woods is a retired FAA principal maintenance inspector for airworthiness. His responsibilities included oversight of the aircraft maintenance industry; certification of repair facilities, mechanics, and aircraft; aviation safety inspections; and accident investigation. His experience included experimental aircraft. He has known Moore for approximately fourteen years, and verified Moore had no violations as an A&P mechanic.

¶38        Woods conducted over thirty aircraft accident investigations. While with the FAA, he was trained in administrative law and regulations, conducting accident investigations, and amateur-built certification. He also conducted seminars on experimental aircraft and procedures for certifying such planes. Woods explained that, in accident investigations, FAA investigators look for witnesses, obtain statements, look for evidence from traffic control tower tapes and people who took pictures or videos, and review any text messages a pilot may have sent requesting help. If an emergency is declared, a tape will be kept until it is determined whether the investigating office wants it.

¶39        Woods testified that, after the crash, he personally inspected Harvey's plane and various documents related to the crash, including Miller's field notes and report. Before the next question, however, Plaintiffs' counsel objected "[b]ased on that line of questioning as far as disclosure" because Woods "was never disclosed as an accident investigation expert." Defense counsel countered that Plaintiffs' counsel's allegation was "not true," and after a brief discussion, Plaintiffs' counsel withdrew the objection, stating, "I'll just cross him on it."

¶40        Woods continued to testify, stating he agreed with the probable cause determination of the NTSB. He then testified that, if an experimental aircraft's airworthiness certificate were surrendered, rescinded, or revoked, the aircraft could still be recertified, and he explained the need and process for doing so. He also stated that, in his opinion, Harvey's airworthiness certificate should not be considered valid because Harvey had "misrepresented his involvement in the building of the aircraft when he submitted the original paperwork." Plaintiffs' counsel did not object to this testimony.

¶41        Based on crash site photos, Woods concluded it did not appear the collapsing of the nose gear caused the bottom of the fuselage to burst open. The opening in the fuselage bottom, as shown by the photographs, had an even line, consistent with being cut, as opposed to the jagged, uneven line of a tear that would have been made when the crash occurred. Further, if the crash had caused the fuselage to burst, followed by the plane sliding off the runway and into the dirt, one would expect to find dirt and debris in the fuselage.

¶42        Plaintiffs' counsel again objected on the basis that Woods had not been disclosed as an accident reconstruction expert. After another discussion, in which the parties disagreed whether the subject had been broached and fully explored during Woods' deposition and whether the

defense's disclosure statement had encompassed Woods "testifying as an accident investigation expert," the trial court sustained the objection.

¶43 Woods then testified without objection about the general impact of certification on the market value of the aircraft. He also testified that his review of the maintenance logs did not indicate that Moore's annual inspections had been deficient or that Moore had ever disassembled the elevator control bracket assembly. Woods also stated that his on-site inspection of the aircraft's elevator control bracket system did not reveal significant wear.

¶44 During cross-examination, Plaintiffs' counsel inquired about Woods' training and experience in accident investigation and his evaluation of Miller's field notes and the cause of the accident, leading to the court ruling the door had been opened for Woods to testify regarding accident investigation. During further cross-examination, Plaintiffs' counsel questioned Woods about the accident investigation.

¶45 On redirect examination, Woods stated that if the elevator control system's hardware had simply fallen off, one would expect to find it in the fuselage. He also testified that, from his experience as a pilot, a pre-flight inspection would typically involve manually moving the elevator, and observing whether the control column moves. A pilot would also pull the control column and observe whether the elevator responds properly. An elevator control bracket disassembled as this one was would probably be detected in the pre-flight inspection. He further affirmed that, if there were no problem with the elevator assembly and the landing were simply botched, an inspector would expect to find the hardware still intact, and if Moore had correctly observed the nuts, bolts, washers, and cotter pins in the elevator control system to be properly installed and secured during his November 15, 2010 inspection, the only way for that system to appear as it does in the post-crash pictures is for someone to have removed those components. With the correct tools, someone could remove those components in approximately ten to fifteen minutes, although no one had ever stepped forward and admitted pulling the cotter pin or otherwise removing the hardware.

¶46 The court then sustained Plaintiffs' counsel's objection to defense counsel's hypothetical asking whether a pilot (presumably Wetherilt) could remove the cotter pins and bolts from the elevator control linkages in an effort to cover up a botched landing. We presume the jury followed the court's preliminary instructions to not consider questions or testimony from which an objection has been sustained. *See LeBlanc*, 186

Ariz. at 439, 924 P.2d at 443. In response to jury questions, Woods testified that sometimes parts cannot be found after a crash, such as those with a fire, or a mid-air disintegration, but when the entire plane comes to the scene of the impact, he has never been unable to find the hardware.

¶47        We find no error requiring reversal. Our review of the transcript containing Woods' testimony leads us to conclude the complained-of testimony was either cumulative to other testimony, was un-objected to, or the door was opened by Plaintiffs' counsel on cross-examination. Further, Plaintiffs do not demonstrate that Woods' testimony fell outside the scope of his expertise or that they were unfairly surprised or prejudiced by his testimony.[17] Moreover, to the extent Plaintiffs simply challenge Woods' credibility, it was within the jury's province to determine his credibility. *See Logerquist v. McVey*, 196 Ariz. 470, 488, ¶ 52, 1 P.3d 113, 131 (2000). The trial court did not abuse its discretion.

        *V.      Moore's Mention of Insurance*

¶48        Plaintiffs argue reversible error occurred when Moore mentioned insurance, a statement they contend was intentionally misleading and prejudicial because it indicated to the jury that Harvey's plane was insured when it was not.

¶49        "Evidence that a person was or was not insured against liability is not admissible to prove whether the person acted negligently or otherwise wrongfully." Ariz. R. Evid. 411.[18] The reason behind the prohibition is that admitting evidence of a defendant's liability insurance creates an unacceptable risk that the jury, either in finding liability or in determining the amount of the award to make, will be influenced by the fact that an insurance policy is available to pay any award made. *See generally Muehlebach v. Mercer Mortuary & Chapel, Inc.*, 93 Ariz. 60, 62, 378 P.2d 741, 742 (1963). However, the mere mention of insurance will not require declaration of a mistrial or a new trial, unless prejudice resulting

---

[17]     In his 8th Supplemental Rule 26.1 Disclosure Statement, Moore disclosed that Woods would "testify about all issues involved in this case," and all issues testified by Woods were explored in Woods' deposition, including the possible reasons for the accident, which were explored extensively.

[18]     The court, however, "may admit this evidence for another purpose, such as proving a witness's bias or prejudice or proving agency, ownership, or control." Ariz. R. Evid. 411.

from it is shown. *Id.* at 64, 378 P.2d at 743; *accord Michael v. Cole*, 122 Ariz. 450, 452, 595 P.2d 995, 997 (1979); *Sheppard v. Crow-Barker Paul No. 1 Ltd. P'ship*, 192 Ariz. 539, 547, ¶ 43, 968 P.2d 612, 620 (App. 1998).

¶50        In this case, the issue of insurance was first mentioned to the jury on the first day of trial by Wetherilt. In discussing the training he provided Harvey for the aircraft, Wetherilt stated, "Usually for most people that are stepping down from private pilot, they have a requirement of five or six hours with an instructor in order to qualify for the insurance for the plane." Harvey testified on the second and third days of trial, and at the conclusion of his testimony, a juror submitted a question asking why Harvey apparently did not have aircraft insurance. The court did not ask the question, but instructed the jury as follows:

> There was another question about whether there was aircraft insurance. And actually I was just going through our final jury instructions. One of the instructions I'm going to give you at the end of the case is that in reaching your verdict you should not consider or discuss whether any party was or was not covered by insurance. Whether any party had insurance or didn't have insurance is not relevant to the facts that you have to determine in this case. So it's a question that doesn't come up in these kinds of cases, insurance.

¶51        On the fourth and final day of trial, insurance was mentioned again—this time by Moore. When asked on direct examination whether he had an opportunity to see Harvey's plane after the crash, Moore affirmed he had. When asked "how that came about," Moore responded as follows:

> Mr. Harvey called me up and said the insurance company was starting to get concerned about the airplane out uncovered and he had to get it back up to Sedona. And I told him I'll go down with a buddy of mine. He said he had a trailer but he didn't have a truck. I said I got a buddy and I got a buddy with a truck. So we went down and picked it up. We folded the wings back and tied everything down, put it on Mr. Patten—Mr. Harvey's trailer and we pulled it back up.

¶52        Plaintiffs' counsel objected, and after approaching the bench, stated outside the presence of the jury, "I know he did it inadvertently, but he mentioned insurance." Counsel for Moore avowed, "I told him please don't mention it." The court began to state it would "tell the jury," and Plaintiffs' counsel interjected, "I understand. I understand. I'm giving you

a heads up. I want to let you know." Plaintiffs' counsel did not move to strike the testimony.

¶53    Later, before the trial court read final instructions to the jury, Plaintiffs' counsel again brought the issue of insurance to the court's attention, stating in part, "I'm not saying it's malicious. I'm not saying it was intentional. I think it was inadvertent. But it still has the same effect[.]" Plaintiffs' counsel then requested "a curative instruction that Mr. Harvey did not have insurance on [the airplane], because he didn't." The trial court denied the request "because we're giving the standard instruction that they should not consider at all insurance, either party." The court later instructed the jury with regard to insurance as follows:

> I told you this earlier but it's important to repeat. In reaching your verdict you should not consider or discuss whether any party was or was not covered by insurance. You need to determine the facts of the case regarding liability and damages and whether any party had or did not have insurance has no bearing on your decisions on those issues.

The subject of insurance was not further mentioned at trial.

¶54    Plaintiffs argue that Moore's mention of insurance was inaccurate because it conflicts with Harvey's declaration filed in support of his motion for new trial that the reason he wanted to move the airplane to Sedona was due to concern that the airplane might be broken into or vandalized, and that a conversation with Moore regarding insurance never occurred. Plaintiffs maintain Moore's mention of insurance misled jurors to believe the airplane was insured when, in truth, it was only insured while on the ground and not in relation to flight or the accident.

¶55    No reversible error resulted from the inadvertent mention of insurance by Moore. In this case, the insurance mentioned was apparently Harvey's, not Moore's, and the context of the testimony by Moore suggests the insurance involved was not liability insurance.[19]    Moreover, Plaintiffs'

---

[19]    *See* Ariz. R. Evid. 411. Even assuming the language of Rule 411 applies to prohibit Moore from testifying about Harvey's insurance, "Rule 411 specifically applies to 'insurance against liability,' and does not mention [property or other] insurance." *Cervantes v. Rijlaarsdam*, 190 Ariz. 396, 398, 949 P.2d 56, 58 (App. 1997). Moreover, even when mentioned in the context of liability insurance, the mere mention of insurance is not necessarily

arguments ignore the context of the statement made by Moore and overstate Moore's testimony in saying Moore "claimed the plane was insured." Moore only related what he believed Harvey said to him, and the jury had ample opportunity to assess Moore's credibility. *See, e.g.*, *Logerquist*, 196 Ariz. at 488, ¶ 52, 1 P.3d at 131. Additionally, Plaintiffs' trial counsel, being present and observing the questions and answers, is the more reliable source for assessing whether Moore's mention of insurance was inaccurate or made with a bad intention. Most importantly, the trial court adequately and correctly addressed the inadvertent mention of insurance in its instructions to the jury. We presume the jury followed the instructions given it. *See LeBlanc*, 186 Ariz. at 439, 924 P.2d at 443. On this record, Plaintiffs have shown no prejudice.

### VI. Denial of Plaintiffs' Motion for New Trial

**¶56** Plaintiffs claim the trial court abused its discretion in denying their motion for new trial because, based on Plaintiffs' previous claims of error, the verdict must have been the result of passion or prejudice.

**¶57** We review the denial of a motion for new trial for an abuse of discretion. *Larsen v. Decker*, 196 Ariz. 239, 244, ¶ 27, 995 P.2d 281, 286 (App. 2000). If it appears clear the jury was actuated by prejudice or passion, its verdict may not stand. *Mayo v. Ephrom*, 84 Ariz. 169, 174, 325 P.2d 814, 817 (1958) (citation omitted). Nevertheless, "[c]ourts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." *Hutcherson v. City of Phoenix*, 192 Ariz. 51, 56, ¶ 27, 961 P.2d 449, 454 (1998) (quoting *Tennant v. Peoria & Pekin Union Ry. Co.*, 321 U.S. 29, 35 (1944)). We generally afford the trial court wide deference because "[t]he judge sees the witnesses, hears the testimony, and has a special perspective of the relationship between the evidence and the verdict which cannot be recreated by a reviewing court from the printed record." *Id.* at 53, ¶ 12, 961 P.2d at 451 (quoting *Reeves v. Markle*, 119 Ariz. 159, 163, 579 P.2d 1382, 1386 (1978)).

**¶58** After thoroughly reviewing the applicable record, we find no abuse of the trial court's discretion in denying a new trial. The trial court, having observed first-hand the witnesses and evidence presented, was best qualified to determine whether a new trial was warranted on the basis the jury acted out of passion or prejudice. On this record, Plaintiffs' generalized

---

grounds for a mistrial, and we will not presume prejudice from the improper admission of insurance-related evidence. *Id.*

claim that the jury's verdict resulted from passion or prejudice is unsupported, and we have found no errors requiring reversal of the verdict.

### VII. Attorneys' Fees on Appeal

**¶59** Noting that this case arises in part out of a contract claim, Moore requests an award of costs and attorneys' fees incurred upon appeal pursuant to A.R.S. § 12-341.01(A) (2016). In our discretion, we decline to award attorneys' fees. We do, however, award an amount of taxable costs to Moore contingent upon his compliance with Rule 21, ARCAP.

### CONCLUSION

**¶60** The trial court's judgment and denial of Plaintiffs' motion for new trial are affirmed.



AMY M. WOOD • Clerk of the Court
FILED:  AA